**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

THE IRON WORKERS LOCAL 580 INSURANCE FUND, individually and on behalf of all others similarly situated,

Plaintiff,

v.

NOVARTIS PHARMACEUTICALS CORPORATION,

Defendant.

Case No. 25-cv-07230

**COMPLAINT FOR VIOLATIONS OF VARIOUS STATE ANTITRUST AND CONSUMER PROTECTION LAWS**

**CLASS ACTION**

**DEMAND FOR JURY TRIAL**

# TABLE OF CONTENTS


I. INTRODUCTION ....... 1

II. JURISDICTION AND VENUE ....... 3

III. PARTIES ....... 3

A. Plaintiff ....... 3

B. Defendant ....... 4

IV. REGULATORY FRAMEWORK ....... 4

A. The Regulatory Regime Governing Approval and Substitution of Generic Drugs ....... 4

1. The Hatch-Waxman Amendments ....... 5

2. Orange Book Listings ....... 6

3. ANDA Filers' Patent Certifications ....... 8

4. Regulatory Exclusivities Applicable to New Drugs ....... 9

5. Labeling Carveouts for Generic Drugs ....... 11

6. Patents are Subject to Judicial and Administrative Scrutiny ....... 12

B. Generic Drugs Drive Down Prices For Purchasers Quickly and Dramatically ....... 14

1. The First AB-Rated Generic is Priced Below the Brand ....... 15

2. Later Generics Drive Prices Down Even Further ....... 16

C. Manipulation of the Regulatory Structure to Impair Competition....... 16

V. FACTUAL ALLEGATIONS ....... 18

A. The Development and Approval of Entresto ....... 18

B. Novartis's Patents and Orange Book Listings ....... 18

C. Approvals for Generic Entresto ....... 21

D. The Improperly Listed '659 Patent ....... 23

1. Novartis Sued All Entresto ANDA Filers, Claiming That Their Generic Versions of Entresto Would Infringe the '659 Patent ....... 24

2. The '659 Patent Does Not Claim a Sacubitril-Valsartan Complex ....... 25

3. Novartis's Listing of the '659 Patent in the Orange Book for Entresto was Improper ....... 26

E. If Novartis Had Not Improperly Listed the ’659 Patent in the Orange Book, At Least One Generic Entresto Would Have Been Available, by January 16, 2025, or Earlier ....27

1. MSN’s Generic Entresto is Sold With Certain Labeling Carveouts That Exclude the Uses Covered by the ’226, ’143, ’192, and ’667 Patents ....29

2. Novadoz Would Have Launched MSN’s Generic Entresto At Risk of the ’918 Patent ....31

3. The Remaining Orange-Book Listed Patents Would Not Have Prevented MSN from Launching Its Generic Entresto ....33

4. Novartis’s Trademark and Trade Dress Litigation Would Not Have Prevented MSN from Launching Its Generic Entresto ....34

VI. MARKET POWER AND DEFINITION ....35

VII. ANTITRUST IMPACT ....38

VIII. INTERSTATE AND INTRASTATE COMMERCE ....39

IX. CLASS ACTION ALLEGATIONS ....40

X. CLAIMS FOR RELIEF ....43

XI. ADEQUATE REMEDIES AT LAW ....77

XII. DEMAND FOR JUDGMENT ....78

XIII. JURY DEMAND ....78

Plaintiff The Iron Workers Local 580 Insurance Fund ("Plaintiff") brings this action, individually and as a class action on behalf of all others similarly situated, against defendant Novartis Pharmaceuticals Corporation ("Novartis" or "Defendant"). Plaintiff's allegations are based upon personal knowledge as to its own acts and upon information and belief as to all other matters alleged herein, including the investigation of counsel, publicly available information, news articles, press releases, and additional analysis.

## I. INTRODUCTION

1. This civil action concerns anticompetitive and illegal conduct by brand drug company Novartis, which extended its monopoly for Entresto,[1] Novartis's blockbuster heart failure drug with more than $4 billion in sales in the United States in 2024.

2. Novartis improperly submitted U.S. Patent Number 8,101,659 (the "'659 patent") for listing in the *Approved Drug Products with Therapeutic Equivalence Evaluations* (the "Orange Book"), which served to delay generic competition to Entresto by at least six months, during which time Novartis sold more than $2 billion of Entresto in the United States.

3. The Orange Book, a publication maintained by the U.S. Food and Drug Administration ("FDA"), lists patents said by their owners to claim FDA-approved drugs. The relevant statute and regulations set forth a "Listing Requirement" with respect to the Orange Book, which provides that a brand drug company, like Novartis, should list "each patent that claims the drug or a method of using the drug . . . and with respect to which a claim of patent infringement could reasonably be asserted[.]"[2] Listing patents in the Orange Book provides brand

---

[1] All references to brand Entresto in this Complaint refer to Entresto tablets sold pursuant to New Drug Application 207620, and all references to generic Entresto refer to all products sold pursuant to Abbreviated New Drug Applications for which brand Entresto is the reference listed drug.
[2] 21 C.F.R. § 314.53(b)(1); *see also* 21 U.S.C. § 355(b)(1).

drug companies, like Novartis, certain market exclusivities (when no competing generic drug products can be sold. The U.S. Federal Trade Commission (the "FTC") and courts across the country have recognized that improperly listing patents in the Orange Book can serve as the basis for a claim that a brand drug company violated the antitrust laws.

4. The '659 patent does not meet the statutory criteria for an Orange Book listing—the '659 patent does not claim the drug substance of Entresto, *i.e.*, a chemical complex of sacubitril and valsartan, nor does it claim Entresto's drug product or a method of using Entresto. The Federal Circuit has confirmed as much, stating unequivocally that "the '659 patent does not claim valsartan-sacubitril complexes[.]" Accordingly, Novartis should never have listed '659 patent in the Orange Book for Entresto.

5. Here, by improperly listing the '659 patent, Novartis was able to secure an additional six months of market exclusivity in the form of a pediatric exclusivity, which prevented the approval of generic competitors to Entresto from at least January 2025 to July 2025. This pediatric exclusivity attached to the '659 patent and was only available to Novartis because it listed the patent in the Orange Book.

6. Plaintiff seeks overcharge damages arising from Novartis's improper Orange Book listing of the '659 patent for Entresto, which delayed the launch of generic Entresto.

7. Novartis's improper listing of the '659 patent prevented generic Entresto from entering the market, delaying competition in the market for brand and generic Entresto in the United States and its territories from at least January 16, 2025 to July 16, 2025 (the "Class Period").

## II. JURISDICTION AND VENUE

8. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action involving common questions of law and fact in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, there are more than one hundred members of the class, and at least one member of the putative class is a citizen of a state different from that one of the Defendant.

9. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 (b), (c), and (d), as a substantial part of the events giving rise to the claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and because Defendant transacts business in this District.

10. This Court has personal jurisdiction over Novartis because, *inter alia*, Novartis has (i) transacted business throughout the United States, including in this District; (b) participated in the selling and distribution of Entresto throughout the United States, including in this District; (c) had and maintained substantial contacts with the United States, including in this District; and/or (d) engaged in alleged unlawful monopolization in the market for Entresto, inflating prices for purchasers, which was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## III. PARTIES

### A. Plaintiff

11. Plaintiff The Iron Workers Local 580 Insurance Fund is a health and welfare benefit fund headquartered and with a principal place of business at 501 W 42nd Street, New York, NY 10036. Plaintiff is a tax-exempt, non-profit organization and a self-insured employee welfare plan, as that term is used in the Employee Retirement Income Security Act of 1974

("ERISA"). Plaintiff provides health benefits, including prescription drug benefits, to its participants, plus their spouses and dependents. During the Class Period (defined below), Plaintiff purchased and/or provided reimbursement for some or all of the purchase price for brand Entresto, other than for re-sale, at supracompetitive prices in at least Arizona, Florida, Georgia, Nevada, New Jersey, and New York. Plaintiff paid and reimbursed more for Entresto than it would have absent Defendant's anticompetitive conduct to delay generic versions of Entresto from launching. As a result of Defendant's wrongful conduct, Plaintiff was injured in its business or property.

### B. Defendant

12. Defendant Novartis Pharmaceuticals Corporation is a corporation organized under the laws of the State of Delaware that has a principal place of business at 59 Route 10, East Hanover, New Jersey 07936.

13. All of Defendant's wrongful actions described in this complaint are part of, and in furtherance of, the illegal monopolization and restraint of trade alleged herein, and were authorized, ordered, and/or undertaken by Defendant's various officers, agents, employees, or other representatives while actively engaged in the management of Defendant's affairs (or that of their predecessors-in-interest) within the course and scope of their duties and employment, and/or with the actual, apparent, and/or ostensible authority of Defendant.

## IV. REGULATORY FRAMEWORK

### A. The Regulatory Regime Governing Approval and Substitution of Generic Drugs

14. Under the federal Food, Drug, and Cosmetic Act ("FDCA"),[3] manufacturers that create a new drug must obtain approval from the FDA to sell the product by filing a New Drug

[3] Pub. L. No. 75-717, 52 Stat. 1040 (1938) (codified as amended in 21 U.S.C. § 301 *et seq*.).

Application ("NDA").[4] An NDA must include specific data concerning the safety and effectiveness of the drug, as well as any information on applicable patents.[5]

### 1. The Hatch-Waxman Amendments

15. The Hatch-Waxman Amendments, enacted in 1984, simplified regulatory hurdles for prospective generic manufacturers by eliminating the need for them to file lengthy and costly NDAs.[6] A manufacturer seeking approval to sell a generic version of a brand drug may instead file an Abbreviated New Drug Application ("ANDA"). An ANDA relies on the scientific findings of safety and effectiveness included in the brand drug company's original NDA and must show that the generic contains the same active ingredient(s), dosage form, route of administration, and strength as the brand drug and that it is bioequivalent. The FDA assigns a generic that meets these criteria relative to its brand counterparts an "AB" rating, and a generic that has received this rating is referred to as an "AB-rated generic."

16. The FDCA and Hatch-Waxman Amendments operate on the principle that bioequivalent drug products containing identical amounts of the same active ingredients, having the same route of administration and dosage form, and meeting applicable standards of strength, quality, purity, and identity are therapeutically equivalent and may be substituted for one another. Bioequivalence demonstrates that the active ingredient of the proposed generic is present in the blood of a patient to the same extent and for the same amount of time as the brand counterpart.[7]

17. Through the Hatch-Waxman Amendments, Congress sought to expedite the entry of less expensive generic competitors to brand drugs, thereby reducing healthcare expenses

---

[4] 21 U.S.C. §§ 301-392.
[5] 21 U.S.C. § 355(a), (b).
[6] *See* Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585 (1984) (codified as amended at 21 U.S.C. § 355).
[7] 21 U.S.C. § 355(j)(8)(B).

nationwide. Congress also sought to protect pharmaceutical manufacturers' incentives to create new and innovative products.

18. The Hatch-Waxman Amendments achieved both goals, advancing the rate of generic product launches substantially and ushering in an era of historically high profit margins for brand pharmaceutical manufacturers. In 1983, before the Hatch-Waxman amendments, only 35% of the top-selling drugs with expired patents had generic alternatives; by 1998, nearly all did. In 1984, revenues for brand and generic prescription drugs totaled $21.6 billion; by 2013, total prescription drug revenues had climbed to more than $392.2 billion, with generics accounting for 86% of prescriptions.[8] Generics are dispensed about 95% of the time when a generic form is available.[9]

**2. Orange Book Listings**

19. As described by the FDA, "[t]he publication, Approved Drug Products With Therapeutic Equivalence Evaluations (the List, commonly known as the Orange Book), identifies drug products approved on the basis of safety and effectiveness by the Food and Drug Administration (FDA) under the Federal Food, Drug, and Cosmetic Act (the FD&C Act)."[10]

20. When a brand drug company submits an NDA for a new drug product for FDA approval, the manufacturer must:

> [F]ile with the application the patent number and the expiration date of any patent which claims the drug for which the applicant submitted the application or which claims a method of using such drug and with respect to which a claim of patent infringement could

---

[8] *See* Murray Aitken, Michael Kleinrock, Jennifer Lyle, Lauren Caskey, *Medicine Use and Shifting Costs of Healthcare: A Review of the Use of Medicines in the United States in 2013*, IMS Institute for Healthcare Informatics 30, 51 (2014).

[9] *Id.*

[10] *Orange Book Preface*, FDA, (Mar. 27, 2025), https://www.fda.gov/drugs/development-approval-process-drugs/orange-book-preface.

> reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug.[11]

21. The class of patents that claim the drug to consist of the "drug substance (active ingredient)," "a drug product (formulation or composition)," or "a method of using such drug for which approval is sought or has been granted in the [patent holder's NDA]."[12]

22. The Federal Circuit has explained that "in order to be listed [in the Orange Book], a patent must ***both*** claim the drug and be infringed by the NDA product."[13]

23. Submission of information on patents that do not meet these criteria is prohibited by law. 21 U.S.C. § 355(c)(2) ("Patent information that is not the type of patent information required by subsection (b)(1)(A)(viii) shall not be submitted under this paragraph.").

24. The FDA reviews the submission for completeness and to determine whether the patent is facially ineligible for listing in the Orange Book.[14] The FDA has expressly declared that it does not "review patent information for its accuracy and relevance."[15]

25. Upon approval of an NDA, the patent information submitted by the NDA holder under 21 U.S.C. § 355(b)(1)(A)(viii) is published by the FDA in the Orange Book. The Orange Book is accessible online at the following web address: https://www.fda.gov/drugs/drug-approvals-and-databases/approved-drug-products-therapeutic-equivalence-evaluations-orange-book.

26. "[T]he FDA does not verify that submitted patents actually meet statutory listing criteria, nor does the FDA proactively remove improperly listed patents" from the Orange

---

[11] 21 U.S.C. § 355(b)(1).
[12] 21 U.S.C. § 355(b)(1)(A)(viii)(I-II).
[13] *Teva Branded Pharm. Prods. R&D, Inc. v. Amneal Pharms. of New York, LLC*, 124 F.4th 898, 912 (Fed. Cir. 2024) (emphasis added).
[14] 21 C.F.R. § 314.53(c)(2)(ii).
[15] 59 Fed. Reg. 50,338, 50,343, 50,345 (Oct. 3, 1994).

Book.[16] Instead, the FDA's role with respect to Orange Book patent listings is "purely ministerial."[17]

27. The brand drug company may also list in the Orange Book, within 30 days of issuance, any patents issued after the FDA approved the NDA.[18] Valid and infringed patents may lawfully prevent generic competition, at least for a period, however brand drug companies can abuse the system to unlawfully delay generic competition.

### 3. ANDA Filers' Patent Certifications

28. To obtain FDA approval of an ANDA, a manufacturer must certify that the generic will not infringe any patents listed in the Orange Book. Under the Hatch-Waxman Amendments, a generic manufacturer's ANDA must contain certain certifications to patents listed in the Orange Book. These certifications include:

a. That no patent for the brand has been filed with the FDA (a "paragraph I certification");

b. That any patent(s) for the brand has/have expired (a "paragraph II certification");

c. That any patent(s) for the brand will expire on a particular date and the manufacturer does not seek to market its generic before that date (a "paragraph III certification"); or

---

[16] *Jazz Pharms., Inc. v. Avadel CNS Pharms., LLC*, 60 F.4th 1373, 1378 (Fed. Cir. 2023).
[17] *Apotex, Inc. v. Thompson*, 347 F.3d 1335, 1347 (Fed. Cir. 2003) (noting FDA arguments that (i) FDA does not have a duty to determine "whether the patent claims the drug," (ii) "FDA has only a ministerial role in the listing process," and (iii) "it is the responsibility of the NDA holder to determine whether a patent claims the drug or a method of using the drug that is the subject of the NDA for purposes of Orange Book listing").
[18] 21 U.S.C. § 355(b)(1), (c)(2).

d. That any patent(s) for the brand is/are invalid or will not be infringed by the generic manufacturer's proposed product (a "paragraph IV certification").[19]

29. Additionally, an ANDA filer may submit a "section viii statement" with its ANDA, certifying that it will carve out patented methods from its drug's production and labeled uses.[20] Often, an ANDA filer that has submitted a section viii statement seeks approval for a product label that differs from the brand product's label by omitting certain methods of use that are covered by the brand drug company's method of use patents.

30. When a generic manufacturer has filed a paragraph IV certification, a brand drug company can automatically delay FDA approval of the ANDA by suing the ANDA applicant for patent infringement. If the brand drug company initiates a patent infringement action against the generic filer within forty-five days of receiving notification of the paragraph IV certification, the FDA will not grant the final approval that the ANDA needs to market and sell its product until the earlier of (i) the passage of 30 months, or (ii) the issuance of a decision by a court that the patent(s) at issue is/are invalid or not infringed by the generic manufacturer's ANDA.[21] Until one of those conditions occurs, the FDA may only grant tentative approval, which indicates that the ANDA meets all regulatory requirements and is approvable but for the thirty-month stay.

### 4. Regulatory Exclusivities Applicable to New Drugs

31. To promote a balance between new drug innovation and generic drug competition, the Hatch-Waxman Amendments also provide for exclusivities (or exclusive marketing rights)

---

[19] 21 U.S.C. § 355 (j)(2)(A)(vii)(IV).

[20] 21 U.S.C. § 355(j)(2)(A)(viii).

[21] 21 U.S.C. § 355(j)(5)(B)(iii). This period is commonly called a "thirty-month Hatch-Waxman stay" or "thirty-month stay." The brand/patent holder can choose to sue the generic after 45 days, including waiting until the generic has launched its product, but, in that event, the brand cannot take advantage of the thirty-month stay of FDA approval, and must instead satisfy the showing required to obtain a preliminary injunction to prevent the generic launch.

for new drugs. The FDA grants any such exclusivities upon approval of a drug if the sponsor and/or drug meet the relevant statutory requirements. Exclusivities applicable for a given drug are listed in the Orange Book, along with any applicable patents, and these exclusivities can run concurrently with the listed patents.

32. One such exclusivity, the New Chemical Entity ("NCE") exclusivity, applies to products containing chemical entities never previously approved by the FDA, either alone or in combination. If a product has received an NCE exclusivity, the FDA may not accept any ANDA for a drug containing the same active moiety for review for five years from the date of the NDA's approval, unless the ANDA contains a certification of patent invalidity or non-infringement, in which case an application may be submitted after four years.[22]

33. A drug product may also receive a three-year period of exclusivity if its sponsor submits a supplemental application that contains reports of new clinical investigations (other than bioavailability studies) conducted or sponsored by the sponsor that were essential to approval of the supplemental application. If this exclusivity is granted, the FDA may not approve an ANDA for that drug for three years from the date on which the supplemental application is approved.[23]

34. Additionally, a brand drug manufacturer can obtain pediatric exclusivity—a six-month extension of any existing regulatory exclusivity or of protection provided by patents listed in the Orange Book for a given drug. The manufacturer can obtain this pediatric exclusivity by conducting pediatric clinical studies in response to a written request from the FDA.

35. Pediatric exclusivity does not stand alone, but attaches to any existing exclusivity or the original patent expiration date for patents listed in the Orange Book.

---

[22] 21 U.S.C. § 355(j)(5)(F)(ii); 21 C.F.R. § 314.108(b)(2).
[23] 21 U.S.C. § 355(j)(5)(F)(iv); 21 C.F.R. § 314.108(b)(2)(5).

36. Specifically, for pediatric exclusivity, when a brand drug company completes a qualifying pediatric study, the FDA will automatically delay approval of an ANDA for a generic version of the drug until six months after the expiration of any patent to which an ANDA filer has submitted a paragraph II or paragraph III certification.[24]

37. Additionally, where an ANDA filer has submitted a paragraph IV certification as to a patent and the brand drug company has qualified for pediatric exclusivity and "in the patent infringement litigation resulting from the certification the court determines that the patent is valid and would be infringed," the period during which the FDA may not approve the ANDA is extended to a date six months after the patent's expiration date.[25]

38. Because ANDA filers submit paragraph II, paragraph III, and paragraph IV certifications only for patents listed in the Orange Book, a patent must be listed in the Orange Book for the six-month pediatric exclusivity to attach.[26]

**5. Labeling Carveouts for Generic Drugs**

39. If an ANDA filer proposes labeling that carves out a patent-protected use of the brand drug, the FDA can lawfully approve the application before patent expiry, and the generic drug may enter the market for uses not covered by the brand drug's patent.

40. FDCA permits a generic drug's labeling to differ from the reference drug's labeling in certain circumstances.[27] Pursuant to FDA regulations implementing this provision of

[24] 21 U.S.C. § 355a(b)(1)(B)(i); § 355a(c)(1)(B)(i).
[25] 21 U.S.C. § 355a(b)(1)(B)(ii); § 355a(c)(1)(B)(ii).
[26] *See* 21 U.S.C. § 355a(b)(1)(B)(i-ii) (applying pediatric exclusivity period to extend delay of ANDA approval to a period six months after the date of expiration of "listed" patents); § 355a(c)(1)(B)(i-ii)(same).
[27] 21 U.S.C. § 355(j)(2)(A)(v).

the FDCA, FDA can approve an ANDA if the generic drug's labeling differs through "omission of an indication or other aspect of labeling protected by patent."[28]

41. The FDA, District of Columbia Circuit, and the U.S. Supreme Court have consistently interpreted the statute and implementing regulation to allow generic manufacturers to carve out patent-protected uses from their labeling, and indeed, several other provisions of the Hatch-Waxman Amendments make clear that Congress intended them to be able to do so.[29]

**6. Patents are Subject to Judicial and Administrative Scrutiny**

42. The existence of one or more patents purporting to cover a drug product does not necessarily mean that the patent owner will be able to use those patents to exclude competition from generics. A patent may be found to be invalid, not infringed, or unenforceable.

43. Patents are routinely invalidated or held unenforceable, either upon reexamination or in *inter partes* proceedings by the U.S. Patent and Trademark Office ("PTO"), by court decision, or by jury verdict.

44. A patent holder always bears the burden of proving infringement. One way that a generic can prevail in patent infringement litigation is to show that its product does not infringe the patent (and/or that the patent holder cannot meet its burden to prove infringement). Another is to show that the patent is invalid or unenforceable.

45. A patent is invalid or unenforceable when, *inter alia*: (i) the disclosed invention is anticipated and/or obvious in light of earlier prior art; (ii) its claims are indefinite, lack sufficient written description, or fail to properly enable the claimed invention; (iii) an inventor, an inventor's attorney, or another person involved with the application, with intent to mislead or

[28] 21 C.F.R. § 314.94(a)(8)(iv).

[29] *See* 21 C.F.R. § 314.94(a)(8)(iv); *Bristol-Myers Squibb Co. v. Shalala*, 91 F.3d 1493, 1499-1500 (D.C. Cir. 1996); *Caraco Pharm. Lab'ys, Ltd. v. Novo Nordisk, A/S*, 566 U.S. 399, 406 (2012); 21 U.S.C. § 355(j)(2)(A)(viii).

deceive the PTO, fails to disclose material information known to that person to be material, or submits materially false information to the PTO during prosecution; and/or (iv) when a later acquired patent is not patentably distinct from the invention claimed in an earlier patent (and no exception, such as the safe harbor, applies).[30]

46. In these circumstances, the PTO's decision to issue a patent does not substitute for a fact-specific assessment of (i) whether the applicant made intentional misrepresentations or omissions on which the PTO relied in issuing the patent, and (ii) whether a reasonable manufacturer in the patent holder's position would have a realistic likelihood of succeeding on the merits of a patent infringement suit.

47. As a statistical matter, if the parties litigate a pharmaceutical patent infringement suit to a decision on the merits, it is more likely that a challenged patent will be found invalid or not infringed than upheld. The FTC reports that generics prevailed in 73% of Hatch-Waxman patent litigation cases resolved on the merits between 1992 and 2002.[31] An empirical study of all substantive decisions rendered in every patent case filed in 2008 and 2009 similarly reports that when a generic challenger stays the course until a decision on the merits, the generic wins 74% of the time.[32]

---

[30] Other actions by the patentee, but less relevant here, can invalidate or otherwise render a patent unenforceable. While not an exhaustive list, such actions include failing to name the correct inventors, failing to adequately describe and claim the invention, and failing to pay the required maintenance fees to the PTO. Licenses and ownership transfers can render a patent unenforceable against a particular infringer, and laches and estoppel can apply when a patent holder delays bringing suit against a known infringer for too long. Lastly, the patent can be unenforceable because its term has expired.

[31] *Generic Drug Entry Prior to Patent Expiration: An FTC Study* at vi-vii, FTC (July 2002), https://www.ftc.gov/sites/default/files/documents/reports/generic-drug-entry-prior-patent-expiration-ftc-study/genericdrugstudy_0.pdf.

[32] John R. Allison, Mark A. Lemley & David L. Schwartz, *Understanding the Realities of Modern Patent Litigation*, 92 Tex. L. Rev. 1769, 1787 (2014) ("[P]atentees won only 164 of the 636 definitive merits rulings, or 26%," and "that number is essentially unchanged" from a decade ago).

48. If a generic manufacturer successfully defends against the brand's infringement lawsuit—either by showing that its ANDA does not infringe any asserted patents and/or that any asserted patents are invalid or unenforceable—the generic may enter the market immediately upon receiving approval from the FDA.

**B. Generic Drugs Drive Down Prices For Purchasers Quickly and Dramatically**

49. Generic versions of brand drugs contain the same active ingredient(s) as the brand drug and are determined by the FDA to be just as safe and effective as their brand counterparts. The price is the only material difference between generics and their corresponding brand versions. Because generics are essentially commodities that cannot be therapeutically differentiated, the primary basis for competition between a brand product and its generic version, or between multiple generic versions, is price.

50. Without AB-rated generics in the market, the manufacturer of a brand drug has a monopoly—every sale of the product, and the accompanying profit, benefits the brand drug company. Without AB-rated generic competition, brand drug companies can, and routinely do, sell their drug for far more than the marginal cost of production, generating profit margins above 70% while making hundreds of millions of dollars, and in the case of Entresto, billions of dollars in sales. The ability to command these kinds of profit margins is what economists call market power.

51. Until a generic version of the brand drug enters the market, there is no bioequivalent drug to substitute for and compete with the brand, and the brand drug company can, therefore, continue to profitably charge supracompetitive prices. Brand drug companies are well aware of generics' rapid erosion of their brand sales. Brand drug companies thus seek to

extend their monopoly for as long as possible, sometimes resorting to any means possible—including illegal means—to delay or prevent generic competition.

52. Since the passage of the Hatch-Waxman Amendments, every state has adopted drug product selection laws that either require or permit pharmacies to substitute AB-rated generic equivalents for brand prescriptions (unless the prescribing physician specifically directs that substitution is not permitted). Substitution laws and other institutional features of pharmaceutical distribution and use create the economic dynamic that the launch of AB-rated generics results both in rapid price decline and rapid sales shift from brand to generic purchasing.

53. Generic competition greatly benefits payers of prescription drugs because they can (i) purchase generic versions of the drug at substantially lower prices and/or (ii) purchase the brand at a reduced price.

### 1. The First AB-Rated Generic is Priced Below the Brand

54. Experience and economic research show that the first generic manufacturer to market its product prices it below its brand counterpart.[33] With the reduction in price and aided by state substitution laws, the first generic manufacturer almost always captures a large share of sales from the brand. The presence of a generic at a lower price reduces the average price for the drug (brand and generic combined).

55. Once generic competition begins, it quickly captures sales of the corresponding brand drug, often 80% or more of the market within the first six months after entry.

---

[33] *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact* at ii-iii, vi, 34, FTC, (Aug. 2011), https://www.ftc.gov/sites/default/files/documents/reports/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission.pdf ("FTC 2011 AG Study"); *Pay-for-Delay: How Drug Company Pay-Offs Cost Consumers Billions* at 8, FTC (Jan. 2010), https://www.ftc.gov/sites/default/files/documents/reports/pay-delay-how-drug-company-pay-offs-cost-consumers-billions-federal-trade-commission-staff-study/100112payfor delayrpt.pdf ("FTC Pay-for-Delay Study").

### 2. Later Generics Drive Prices Down Even Further

56. Once additional generic competitors enter the market, the competitive process accelerates, and multiple generic manufacturers typically compete vigorously with each other over price, driving prices down toward marginal manufacturing costs.[34] The FTC found that on average, within a year of generic entry, generics had captured 90% of corresponding brand sales and (with multiple generics on the market) prices had dropped 85%.[35]

57. According to the FDA and the FTC, the greatest price reductions are experienced when the number of generic competitors goes from one to two.

### C. Manipulation of the Regulatory Structure to Impair Competition

58. As noted above, when a brand drug company sells a pharmaceutical product with no generic competition in the marketplace, the brand drug company receives all the profits from all unit sales. In this circumstance, a brand drug company can typically sell its drug for far more than the marginal cost of production, often generating profit margins of 70% or more while achieving hundreds of millions, or billions, of dollars in sales. The ability to achieve those kinds of profit margins is what economists refer to as market power.

59. When a generic equivalent enters the market, however, it quickly captures 80% or more of the unit sales from the brand drug. Consequently, the brand drug company loses most of the unit sales. The generic manufacturer sells almost all of the units but at drastically reduced prices—delivering enormous savings to drug purchasers. When multiple generics compete in the market, that competition drives prices down to a level near the marginal cost of production. This

---

[34] *See, e.g.*, Tracy Regan, *Generic Entry, Price Competition, and Market Segmentation in the Prescription Drug Market*, 26 Int'l J. Indus. Org. 930 (2008); Richard G. Frank, *The Ongoing Regulation of Generic Drugs*, 357 New Eng. J. Med. 1993 (2007); Patricia M. Danzon & Li-Wei Chao, *Does Regulation Drive Out Competition in Pharmaceutical Markets?*, 43 J.L. & Econ. 311 (2000).

[35] FTC Pay-for-Delay Study at 8.

competition ends the brand drug company's market power and delivers even more savings to drug purchasers. Through competition, what were formerly profits are converted into savings for purchasers.

60. Improperly listing patents in the Orange Book that do not meet the statutory listing criteria impairs the ability of generics to enter the market, undermining competition.

61. As the FTC recognized in a September 2023 policy statement, "[i]mproper Orange Book listing may have played a role in distorting pharmaceutical markets for decades," with brand drug companies exploiting the Orange Book listing process to "prevent or delay the marketing of generic drugs."[36]

62. The FTC also specifically explained that improper listing of patents in the Orange Book "may . . . constitute illegal monopolization."[37] Moreover, courts have recognized that improper Orange Book listings may form the basis of claims for violation of the antitrust laws.[38]

63. Improper Orange Book listings are fundamentally anticompetitive and contrary to the goals of the Hatch-Waxman statutory scheme. They extend the brand drug company's monopoly by blocking access to more affordable generic drugs and reducing competition among generics, forcing purchasers to pay more than they should.

---

[36] *Federal Trade Commission Statement Concerning Brand Manufacturers' Improper Listing of Patents in the Orange Book* at 3, FTC (Sept. 14, 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/p239900orangebookpolicystatement092023.pdf.

[37] *Id*. at 5.

[38] *See, e.g.*, *Teva Branded Pharm. Prods. R&D, Inc. v. Amneal Pharms. of N.Y., LLC*, 124 F.4th 898 (Fed. Cir. 2024) (affirming judgment that brand drug company violated the federal antitrust laws by improperly listing a patent that related to a device, rather than the drug itself, in the Orange Book); *UFCW Local 1776 v. Takeda Pharm. Co.*, 11 F.4th 118, 136 (2d Cir. 2021) (affirming denial of motion to dismiss monopolization claim where plaintiff alleged brand drug company delayed generic competition by improperly listing patents that did not claim its drug in the Orange Book).

## V. FACTUAL ALLEGATIONS

### A. The Development and Approval of Entresto

64. Novartis is the registered holder of approved New Drug Application No. 207620 for the manufacture and sale of the drug Entresto (sacubitril/valsartan). The FDA approved Entresto on July 7, 2015, and Novartis began selling Entresto in the United States shortly thereafter.

65. Entresto is an angiotensin receptor-neprilysin inhibitor ("ARNI") used to treat heart failure. Brand Entresto was the first and only ARNI drug on the market until generic Entresto launched in July 2025.

66. The active ingredient in Entresto is a valsartan-sacubitril complex that helps to relax blood vessels and decrease sodium and fluid in the body.[39]

67. Entresto is Novartis's top-grossing drug and has generated significant revenue and profits for Novartis. In 2024, Novartis grossed more than $4 billion in sales of Entresto in the United States.

### B. Novartis's Patents and Orange Book Listings

68. Novartis owns and/or has obtained assignments to numerous patents and has listed numerous patents in the Orange Book, claiming that those patents covered Entresto.

69. Novartis has also obtained an assignment for and has asserted claims for infringement of at least one patent that was not listed in the Orange Book that it alleges were infringed by generic Entresto ANDA products.

70. Novartis's asserted patents relating to Entresto (including those listed in the Orange Book for NDA 207620), along with their titles and expiration dates, are as follows:

---

[39] *How Entresto Works*, Entresto, https://www.entresto.com/how-entresto-works (last visited Aug. 15, 2025.).

| U.S. PATENT NO. | TITLE | ISSUE DATE | EXPIRATION DATE | LISTED IN ORANGE BOOK |
|---|---|---|---|---|
| 7,468,390<br><br>(the "'390 patent") | Methods of treatment and pharmaceutical composition | 12/23/2008 | 11/27/2023<br><br>(with pediatric exclusivity extending until May 27, 2024) | Yes |
| 8,101,659<br><br>(the "'659 patent") | Methods of treatment and pharmaceutical composition | 1/24/2012 | 1/15/2025<br><br>(with pediatric exclusivity extending until July 15, 2025) | Yes |
| 8,404,744<br><br>(the "'744 patent") | Methods of treatment and pharmaceutical composition | 3/26/2013 | 1/14/2023<br><br>(with pediatric exclusivity extending until July 14, 2023) | Yes |
| 8,796,331<br><br>(the "'331 patent") | Methods of treatment and pharmaceutical composition | 8/5/2014 | 1/14/2023<br><br>(with pediatric exclusivity extending until July 14, 2023) | Yes |
| 8,877,938<br><br>(the "'938 patent") | Compounds containing S-N-valeryl-N-{[2′-(1H-tetrazole-5-yl)-biphenyl-4-yl]-methyl}-valine and (2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester moieties and cations | 11/4/2014 | 05/27/2027<br><br>(with pediatric exclusivity extending until November 27, 2027) | Yes |

| U.S. PATENT NO. | TITLE | ISSUE DATE | EXPIRATION DATE | LISTED IN ORANGE BOOK |
|---|---|---|---|---|
| 9,388,134<br><br>(the "'134 patent") | Compounds containing S-N-valeryl-N-{[2′-(1H-tetrazole-5-yl)-biphenyl-4-yl]-methyl)-valine and (2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester moieties and cations | 7/12/2016 | 11/8/2026<br><br>(with pediatric exclusivity extending until May 8, 2027) | Yes |
| 9,517,226<br><br>(the "'226 patent") | Inhibitors for treating diseases characterized by atrial enlargement or remodeling | 12/13/2016 | 8/22/2033 | Yes |
| 9,937,143<br><br>(the "'143 patent") | Inhibitors for treating diseases characterized by atrial enlargement or remodeling | 4/10/2018 | 8/22/2033 | Yes |
| 11,058,667<br><br>(the "'667 patent") | Sacubitril-valsartan dosage regimen for treating heart failure | 7/13/2021 | 5/9/2036 | Yes |

| U.S. Patent No. | Title | Issue Date | Expiration Date | Listed in Orange Book |
|---|---|---|---|---|
| 11,135,192 (the "'192 patent") | Inhibitors for treating diseases characterized by atrial enlargement or remodeling | 10/5/2021 | 8/22/2033 | Yes |
| 11,096,918 (the "'918 patent") | Amorphous solid form of compounds containing S—N-valeryl-N-{[2′-(1H-tetrazole-5-yl)-biphenyl-4-yl]-methyl}-valine and (2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester moieties and sodium cations | 8/24/2021 | 11/8/2026 | No |

71. Because Novartis had listed patents in the Orange Book for Entresto, potential generic competitors were required to certify against any patents that were listed at the time when they filed ANDAs for their generic Entresto products.

**C. Approvals for Generic Entresto**

72. Due to the large market for Entresto, it was not long before other pharmaceutical manufacturers began undertaking efforts to launch their own generic versions of the drug.

73. Potential generic competitors' efforts to enter the market to compete with Entresto were impacted by Novartis's Entresto-related patents.

74. At least eighteen generic manufacturers have filed ANDAs for generic versions of Entresto. Thirteen of these generic manufacturers have received final approval to market AB-rates generic versions of Entresto.

75. The ANDAs for generic Entresto that have obtained final approval from the FDA are:

a. ANDA No. 213682 (held by Alembic Pharmaceuticals Limited; approved May 28, 2024);

b. ANDA No. 213764 (held by Alkem Laboratories Ltd; approved September 16, 2024);

c. ANDA No. 213680 (held by Biocon Pharma; approved August 30, 2024);

d. ANDA No 213605 (held by Crystal Pharmaceutical (Suzhou) Co., Ltd.; approved May 28, 2024);

e. ANDA No. 213627 (held by Dr. Reddy's Laboratories; approved January 13, 2025);

f. ANDA No 213668 (held by Hetero Labs Limited; approved July 17, 2025);

g. ANDA No. 213676 (held by Laurus Generics Inc.; approved May 28, 2024);

h. ANDA No. 213808 (held by Lupin Inc.; approved January 8, 2025);

i. ANDA No. 213728 (held by Macleods Pharmaceuticals Ltd.; approved October 16, 2024);

j. ANDA No. 213748 (held by MSN Pharmaceuticals, Inc.; initial final approval issued July 24, 2024[40]);

k. ANDA No. 213611 (held by Novugen Pharma SDN; approved July 16, 2025);

l. ANDA No. 213604 (held by Torrent Pharmaceuticals; approved August 22, 2024); and

m. ANDA No. 213719 (held by Zydus Pharmaceuticals (USA) Inc.; approved July 9, 2024).

**D. The Improperly Listed ’659 Patent**

76. As the NDA holder for Entresto, Novartis filed requests with the FDA pursuant to 21 U.S.C. § 355(b)(1) to list the ’659 patent in the Orange Book for Entresto.

77. In so doing, Novartis represented to the FDA that the ’659 patent claims the drug for which the application was submitted (i.e., Entresto) and could serve as the basis of a claim for patent infringement if a person not licensed by the Novartis engaged in the manufacture, use, or sale of the drug.[41]

78. Claim 1 of the ’659 patent recites a pharmaceutical composition comprising (i) valsartan, (ii) sacubitril, and (iii) a pharmaceutically acceptable carrier, (iv) where the valsartan and sacubitril are administered ***in combination*** in a 1:1 ratio. (emphasis added). It states:

> A pharmaceutical composition comprising: (i) the AT 1-antagonist Valsartan or a pharmaceutically acceptable salt thereof; (ii) the NEP inhibitor N-(3-carboxy-1-oxopropyl)-(4S)-(p- phenylphenylmethyl)-4-amino-2R-methylbutanoic acid ethyl ester or (2R,4S)-5-biphenyl-4-yl-4(3-car boxy-propionyl amino)-2-methyl-

[40] Initially, the FDA issued a final approval for MSN’s ANDA on July 24, 2024. Following a Federal Circuit ruling that the ’659 patent was valid (discussed more fully below), the district court judge overseeing the patent litigation ordered the FDA to reset the final approval date to July 16, 2025, the first day following the expiration of the ’659 patent’s pediatric exclusivity.

[41] *See* 21 U.S.C. § 355(b)(1).

> pentanoic acid or a pharmaceutically acceptable salt thereof, and (iii) a pharmaceutically acceptable carrier; wherein said (i) AT 1-antagonist Valsartan or pharmaceutically acceptable salt thereof and said (ii) NEP inhibitor N-(3-carboxy-1-oxopropyl)-(4S)-(p-phenylphenylm ethyl)-4-amino-2R-methylbutanoic acid ethyl ester or (2R,4S)-5-biphenyl-4-yl-4(3-carboxy-propionyl amino)-2-methyl-pentanoic acid or pharmaceutically acceptable salt thereof, are administered in combination in about a 1:1 ratio.[42]

79. Because Novartis identified the ’659 patent for inclusion in the Orange Book listing for Entresto, and because Novartis completed a qualifying pediatric study, a six-month pediatric exclusivity period attached to the end of the ’659 patent’s term. While the ’659 patent itself expired on January 15, 2025, this pediatric exclusivity allowed Novartis to exclude generic competition for Entresto until July 16, 2025.[43]

#### 1. Novartis Sued All Entresto ANDA Filers, Claiming That Their Generic Versions of Entresto Would Infringe the ’659 Patent

80. Upon receiving paragraph IV notices from the generic manufacturers who had submitted ANDAs for generic Entresto, Novartis initiated patent infringement litigation against each ANDA filer, including filing claims against each ANDA filer alleging infringement of the ’659 patent.[44]

81. The ANDA products at issue, like Entresto, contained a sacubitril-valsartan complex.

82. During the claim construction phase of the ’659 patent litigation, the parties agreed that claim 1 of the ’659 patent encompassed a two-drug physical mixture, but disputed whether

[42] U.S Patent No. 8,101,659.
[43] Generic Entresto was delayed several additional days, until July 22, 2025, due to the Federal Circuit’s administrative stay in the ’918 patent infringement litigation discussed in Section V.E.2 below.
[44] *See generally In re: Entresto (Sacubitril/Valsartan) Patent Litig.*, No. 1:20-md-02930 (D. Del.).

the patent claimed a single valsartan-sacubitril complex, as opposed to valsartan and sacubitril as "two separate components."[45]

83. The district court construed claim 1 of the '659 patent as "not limited to separate compounds."[46]

84. Following the claim construction ruling, each of the ANDA filers stipulated that their generic versions of Entresto would infringe the '659 patent.

85. Despite dropping their infringement challenge, the ANDA filers continued to challenge the '659 patent by arguing that the '659 patent was invalid.

86. Following a bench trial, the district court found that the '659 patent was invalid for lack of written description, basing its reasoning on the fact that that Novartis's scientists did not possess valsartan-sacubitril complexes at the time of the invention in 2002, having first discovered a valsartan-sacubitril complex in January 2006.[47]

### 2. The '659 Patent Does Not Claim a Sacubitril-Valsartan Complex

87. After the district court's ruling that the '659 patent was invalid, Novartis appealed the finding of invalidity to the Federal Circuit Court of Appeals.

88. On January 10, 2025, the Federal Circuit reversed the district court's ruling, holding that the '659 patent is valid.[48] The Court held that "[t]he issue on appeal is whether the '659 patent describes what is claimed, viz., a pharmaceutical composition comprising valsartan and sacubitril administered 'in combination.' The issue is not whether the '659 patent describes

[45] *In re Entresto (Sacubitril/Valsartan) Pat. Litig.*, 2021 WL 2856683, at *3 (D. Del. July 8, 2021).
[46] *Id*.
[47] *In re Entresto (Sacubitril/Valsartan) Pat. Litig.*, 2023 WL 4405464, at *13, 22 (D. Del. July 7, 2023).
[48] *In re Entresto*, 125 F.4th 1090 (Fed. Cir. 2025).

valsartan-sacubitril complexes. Because the ’659 patent does not claim valsartan-sacubitril complexes, those complexes need not have been described.”[49]

89. The Federal Circuit explained that “to the extent [the ’659 patent] claims were construed to claim valsartan-sacubitril complexes . . . that construction would have been error.”[50] Because “valsartan-sacubitril complexes were undisputedly unknown at the time of the invention,” the Federal Circuit held that “the ’659 patent *could not have been construed* as claiming those complexes as a *matter of law*.”[51] In fact, valsartan-sacubitril complexes were “not discovered until four years after the priority date of the ’659 patent[.]”[52]

90. The Federal Circuit went on to conclude that the “patent does not claim as its invention valsartan-sacubitril complexes,” noting that “[i]ndeed, Novartis obtained separate, later patents to such complexes.”[53]

### 3. Novartis’s Listing of the ’659 Patent in the Orange Book for Entresto was Improper

91. The ’659 patent was never properly listed in the Orange Book for Entresto because the ’659 patent’s claims do not claim a chemical complex of sacubitril and valsartan, and, consequently, the ’659 patent does not claim Entresto.

92. The ’659 patent does not meet the statutory requirements for being properly listed in the Orange Book for Entresto. The ’659 patent does not claim Entresto, Entresto’s drug

---

[49] *Id.* at 1097.
[50] *Id.* at 1099 n.5.
[51] *Id.* (emphasis added).
[52] *Id.* at 1098.
[53] *Id.* at 1099. Specifically, the later patents referenced by the Court are the ’938 and ’134 patents, both of which claim a novel compound comprising non-covalently bound valsartan and sacubitril salts.

substance, Entresto's drug product or a method of using Entresto as required to be properly listed in the Orange Book.[54]

93. Because the valsartan and sacubitril salts in Novartis's Entresto product are present in a single chemical structure called a "complex," where the components are associated by non-covalent bonds, Novartis's Entresto product cannot infringe the claims of the '659 patent as a matter of law.[55]

94. And, because Novartis listed the '659 patent in the Orange Book for Entresto (and because Novartis completed a qualifying pediatric study), a six-month pediatric exclusivity period attached to the end of the '659 patent's term. If the '659 patent had not been listed in the Orange Book, Novartis would not have been able to secure an additional six months of pediatric exclusivity.[56]

### E. If Novartis Had Not Improperly Listed the '659 Patent in the Orange Book, At Least One Generic Entresto Would Have Been Available, by January 16, 2025, or Earlier

95. Novartis benefitted from its improper Orange Book listing by avoiding fair and legal competition. Rather than face competition from a generic Entresto product, Novartis enjoyed a complete monopoly until July 22, 2025, when MSN's marketing partner Novadoz launched MSN's generic Entresto.[57]

96. By improperly submitting the '659 patent for inclusion in the Orange Book for Entresto, Novartis gained an unwarranted six-month extension to its monopoly on Entresto.

[54] *See* 21 U.S.C. § 355(b)(1)(A)(viii)(I-II).
[55] *See* 21 U.S.C. § 355(b)(1)(A)(viii).
[56] *See* 21 U.S.C. § 355a(b)(1)(B)(i-ii); § 355a(c)(1)(B)(i-ii) (providing that pediatric exclusivity is applied to certain *listed* patents).
[57] On information and belief, ten additional versions of generic Entresto subsequently launched on or about July 24, 2025.

97. Because the ’659 patent does not claim Entresto, pediatric exclusivity never should have attached to the patent to delay generic Entresto. However, because Novartis had improperly submitted the ’659 patent for Orange Book listing, once the court ruled that the ’659 patent was valid (the parties already having stipulated to infringement), the FDA was not permitted to approve MSN’s ANDA until six months after the ’659 patent’s expiration (July 16, 2025).

98. Because the FDA had already issued a final approval of MSN’s ANDA, upon issuance of the Federal Circuit’s mandate in the ’659 patent validity litigation, the district court immediately entered its Final Judgment, ordering that the effective date of MSN’s ANDA approval “shall be no earlier than July 16, 2025, the date after the expiration of pediatric exclusivity awarded to Novartis[.]”[58]

99. The unlawful ’659 patent Orange Book listing allowed Novartis to extend its monopoly and to continue profitably charging supracompetitive prices for much longer than would have otherwise been possible.

100. If pediatric exclusivity had not been improperly applied to the ’659 patent, ANDA holders would have been able to launch generic versions of Entresto by January 16, 2025, the day following the ’659 patent’s expiration.

101. At the time of the ’659 patent’s expiration (without pediatric exclusivity) on January 15, 2025, eleven ANDA filers had obtained final approval for their generic versions of Entresto.

[58] *See* Final Judgment at 3, *In re: Entresto (Sacibitril/Valsartan) Patent Litig.*, No. 1:20-md-02930 (D. Del. Apr. 1, 2025), ECF No. 1824.

102. Sales of Entresto totaled more than $2.2 billion in the six months from January 16, 2025 to July 16, 2025 alone. If a competitor had launched a generic version of Entresto during that period, the generic would have captured a large share of those sales.

103. On July 22, 2025, immediately upon the expiration of an administrative stay discussed in Section V.E.2 below, MSN's marketing partner Novadoz launched the first generic version of Entresto. On information and belief, another ten generic versions of Entresto launched shortly thereafter, on or about July 24, 2025.

104. The timing of these generic launches—with Novadoz entering the market as soon as there was no court order blocking it from doing so and other generic manufacturers entering the market days in the following days indicates that, absent Novartis's improper listing of the '659 patent, Novadoz would have launched MSN's generic version of Entresto by at least January 16, 2025, and a large number of other generics would have entered the market almost immediately afterward.

### 1. MSN's Generic Entresto is Sold With Certain Labeling Carveouts That Exclude the Uses Covered by the '226, '143, '192, and '667 Patents

105. The pediatric exclusivity applying to the '659 patent was the sole factor preventing MSN from launching its generic version of Entresto. Although Novartis had listed additional patents, which had not yet expired as of January 16, 2025 in the Orange Book for Entresto, those patents would not have prevented MSN's generic launch.

106. The '226 patent, '143 patent, and '192 patent are "use patents" that purportedly cover use of Entresto to treat certain chronic heart failure patients, classified as patients with "preserved" ejection fraction (as distinguished from patients with "reduced" ejection fraction).

107. The '667 patent is a "dosage patent" that purportedly covers a modified dosing regimen of the drug for a certain subset of patients newer to the medication.

108. MSN submitted section viii carveout statements with its ANDA, representing that the ’226 patent, ’143 patent, ’667 patent, and ’192 patent are method of use patents that do not claim any indication or other conditions for which MSN sought approval under its ANDA.

109. The label for MSN’s generic carves out Entresto’s approved use for chronic heart failure patients who would be categorized within prevailing definitions of preserved or normal ejection fraction: by adding narrowing language to specify that MSN’s generic is approved only for patients “with chronic heart failure and reduced ejection fraction.”[59]

| BRAND ENTRESTO LABEL | MSN GENERIC ENTRESTO LABEL |
|---|---|
| ENTRESTO is indicated to reduce the risk of cardiovascular death and hospitalization for heart failure in adult patients with chronic heart failure. Benefits are most clearly evident in patients with left ventricular ejection fraction (LVEF) below normal.<br><br>LVEF is a variable measure, so use clinical judgment in deciding whom to treat. | Sacubitril and valsartan tablets are indicated to reduce the risk of cardiovascular death and hospitalization for heart failure in adult patients with chronic heart failure and reduced ejection fraction.<br><br>Left ventricular ejection fraction (LVEF) is a variable measure, so use clinical judgment in deciding whom to treat. |

110. This labeling carveout has allowed MSN to obtain FDA final approval for its ANDA without infringing the use patents.

111. MSN also employs a carveout on its generic Entresto label to exclude the use protected by the dosage patent, omitting Section 2.6 of brand Entresto’s package insert, which instructs prescribers to introduce patients with less experience taking angiotensin-converting enzyme (ACE) inhibitor or angiotensin II receptor blocker (ARB)[60] drugs (a different type of drug also used to treat heart failure) more slowly to Entresto, as consistent with the prescribers’ clinical judgment.

[59] *Novartis Pharms Corp. v. Becerra*, 2024 WL 4492072, at *5 (D.D.C. 2004).
[60] *Id.*

112. The FDA issued final approval to MSN's ANDA notwithstanding the differences between the product labels for brand Entresto and MSN's generic.

113. Novartis challenged the FDA's approval of MSN's ANDA with its labeling changes by filing a complaint against the FDA seeking temporary, preliminary, and permanent injunctive relief in the District of D.C.[61]

114. The district court denied relief on the ground that Novartis failed to show that it would suffer irreparable harm absent the injunction.[62] The district court then issued its ruling on the merits, rejecting each of Novartis's challenges to FDA's approval of the generic version of Entresto. The court granted summary judgment to the FDA after determining that approval of MSN's generic is "consistent with FDA regulatory and statutory requirements . . . to have the same label and active ingredients as the reference drug," and that "FDA did not act arbitrarily by excluding part of Entresto's dosing regimen from MSN's generic drug label."[63] Novartis appealed this ruling to the District of Columbia Circuit.[64]

115. Novartis's litigation with the FDA was not a barrier to Novadoz's launch of MSN's generic Entresto—when Novadoz launched its generic on July 22, 2025, Novartis's appeal remained pending.

**2. Novadoz Would Have Launched MSN's Generic Entresto At Risk of the '918 Patent**

116. By January 2025, Novartis had resolved all of the patent infringement claims that it had filed against MSN, other than the claims regarding the '659 patent (which MSN continued

[61] Complaint, *Novartis Pharms Corp. v. Becerra*, No. 24-cv-02234 (D.D.C. July 30, 2024), ECF No. 1.
[62] *Novartis Pharms. Corp. v. Becerra*, 2024 WL 3823270, (D.D.C. Aug. 13, 2024).
[63] *Novartis Pharms Corp. v. Becerra*, 2024 WL 4492072 at *7.
[64] *Novartis Pharms Corp. v. Kennedy*, No. 24-05235 (D.C. Cir. Oct. 15 2024).

to challenge by seeking rehearing in the Federal Circuit) and a claim that MSN's (and Noratech's) generic version of Entresto would infringe the '918 patent.

117. The '918 patent, entitled "Amorphous solid form of compounds containing S—N-valeryl-N-{[2′-(1H-tetrazole-5-yl)-biphenyl-4-yl]-methyl}-valine and (2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester moieties and sodium cations," expires in November 2026. Novartis did not list the '918 patent in the Orange Book for Entresto.

118. On October 24, 2022, Novartis filed a complaint in the District of Delaware alleging that MSN's generic version of Entresto infringed the '918 patent.[65] In August 2024, after MSN had initially obtained final approval of its generic Entresto ANDA, Novartis filed a motion for preliminary injunction seeking to bar MSN from launching its generic under the theory that doing so would infringe the '918 patent.[66]

119. Initially, the district court denied Novartis's motion for a preliminary injunction on August 12, 2024, finding that Novartis had failed to demonstrate a reasonable likelihood that it would succeed in showing that MSN's (and fellow ANDA filer Noratech's) generic Entresto would infringe the '918 patent.[67]

120. The case proceeded to a bench trial in December 2024, with the court ruling that Novartis failed to prove that MSN infringed the '918 patent.[68] Specifically, the court found that

---

[65] Complaint, *Novartis Pharms Corp. v. MSN Pharms Inc.*, No. 22-cv-01395 (D. Del. Oct. 24, 2022), ECF No. 1.
[66] Mot. for Prelim. Inj., *Novartis Pharms Corp. v. MSN Pharms Inc.*, No. 22-cv-01395 (D. Del. Aug. 2, 2024.), ECF No. 213.
[67] Mem. And Order, *Novartis Pharms Corp. v. MSN Pharms Inc.*, No. 22-cv-01395 (D. Del. Aug. 12, 2024), ECF No. 239.
[68] Noratech reached a settlement with Novartis before the Court rendered its judgment.

one of the reference spectrums on which Novartis's expert had relied to compare the compounds in MSN's and Novartis's products was unreliable.[69]

121. Notwithstanding the pending '918 patent litigation, MSN began importing Entresto active pharmaceutical ingredient into the United States on or around December 19, 2025.

122. According to court filings made by Novartis "MSN has repeatedly indicated that it will launch [its generic Entresto] in any unenjoined window."[70]

### 3. The Remaining Orange-Book Listed Patents Would Not Have Prevented MSN from Launching Its Generic Entresto

123. Although the '134 patent and '938 patents, which purport to claim the valsartan-sacubitril complex, have not yet expired, neither of these patents would have interfered with MSN's ability to launch its generic Entresto if Novartis had not improperly listed the '659 patent.

124. Novartis initially sued MSN (and other ANDA filers), alleging that their generic Entresto products would infringe the '134 and '938 patents.[71] Before the court examined the merits of the claims that MSN's generic Entresto would infringe the '134 patent and '938 patent, Novartis withdrew these claims in May 2023.[72]

125. While Novartis ultimately obtained a ruling that Mylan's generic Entresto infringed the '938 and '134 patents,[73] Novartis had already withdrawn these claims against MSN

[69] *Novartis Pharms Corp. v. MSN Pharms Inc.*, 2025 WL 1911823, (D. Del. July 11, 2025), Final Judgment, *Novartis Pharms Corp v. MSN Pharms. Inc*., No. 22-cv-01395 (D. Del. July 11, 2024), ECF No. 524.

[70] *See, e.g.*, Novartis's Expedited Mot. at 29, *Novartis AG. v. Novadoz Pharms, LLC*, No. 25-2346 (3d Cir. July 17, 2025), ECF No. 8-1.

[71] *See* Complaint, *Novartis Pharms Corp.. v. Alembic Pharms*, No. 22-cv-1395 (D. Del.Oct. 24, 2022), ECF No. 1 (bringing claims against MSN and other ANDA filers for infringement of the '938 and '134 patents).

[72] *See Novartis Pharms Corp. v. Alembic Pharms*, 2023 WL 6387975, at *1 (D. Del. Sept. 29, 2023), (citing two sealed docket entries and noting that "Novartis has since withdrawn its '938 and '134 patent infringement claims against both Noratech and MSN.").

[73] Am. Mem. Op. and Order, *Novartis Pharms Corp. v. Mylan Pharms Inc.*, No. 19-cv-201 (N.D. W. Va. Jan. 31, 2024), ECF No. 162.

and had agreed to dismiss these claims early in the patent litigation against many ANDA filers.[74] This suggests that ANDA holders are likely to have been able to launch during the Class Period without infringing the ’134 and ’938 patents.

#### 4. Novartis’s Trademark and Trade Dress Litigation Would Not Have Prevented MSN from Launching Its Generic Entresto

126. On January 30, 2025, Novartis filed a complaint against MSN and its marketing partner Novadoz, alleging that selling MSN’s generic Entresto would infringe Novartis’s trademark and trade dress.[75] Novartis alleged that MSN’s generic tablets were likely to confuse consumers because they are similar to brand Entresto in size, shape, and color and that selling the generic with Novadoz may create confusion since Novadoz’s name is similar to the name “Novartis” and to the name of Novartis’s generics partner Sandoz.

127. If Novartis had not improperly listed the ’659 patent in the Orange Book, MSN would have launched its generic Entresto on or before January 16, 2025. On that date, Novartis had not yet filed its claims for trademark and trade dress infringement against MSN and Novadoz, and MSN would have had no reason to delay launching its generic Entresto.

128. Moreover, Novartis’s trademark and trade dress claims are without merit.

129. In its March 17, 2025 ruling on Novartis’s motion for a preliminary injunction in the trademark/trade dress litigation, the court found that Novartis had failed to show that it was

---

[74] *See* Stipulation, *Novartis Pharms Corp. v. Alembic Pharms. Ltd.*, No. 19-cv-02021 (D. Del. Feb. 11, 2020), ECF No. 22 (dismissing ’938 and ’134 claims against Natco); *In re Entresto (Sacubitril/Valsartan) Patent Litig.*, No. 20-md-2930 (D. Del.), ECF No. 427 (Nov. 24, 2021) (dismissing ’938 and ’134 claims against Macleod’s), ECF No. 430 (Nov. 24, 2021) (dismissing ’938 and ’134 claims against Hetero), ECF No. 445 (Dec. 1, 2021) (dismissing ’938 and ’134 claims against Lupin), ECF No. 353 (Sept. 21, 2021) (dismissing ’938 and ’134 claims against Alkem), ECF No. 447 (Dec. 2, 2021) (dismissing ’938 and ’134 claims against Alembic).

[75] Complaint, *Novartis AG v. Novadoz Pharms. LLC*, No. 25-cv-00849 (D.N.J. Jan. 30, 2025), ECF No. 1.

likely to succeed on the merits of its trademark infringement claim.[76] Although the court initially granted a preliminary injunction, finding that Novartis had shown a likelihood of success on its trade dress infringement claim, the same court stayed this injunction shortly thereafter, concluding that it had improperly applied the law governing Novartis's trade dress claim.[77]

130. The court subsequently undertook *sua sponte* reconsideration of its preliminary injunction ruling.[78] On reconsideration, the court concluded that Novartis was unlikely to succeed on its trade dress infringement claim, vacating the preliminary injunction.[79] The court explained that in initially awarding the preliminary injunction, it had committed an "error" because it "imposed too high a standard in its assessment of non-functionality [and] did not take the nature of Novartis's product configuration trade dress claim into account for secondary meaning or likelihood of confusion[.]"[80] Accordingly, MSN would not have delayed launching its generic Entresto on the basis of hypothetical, meritless claims.

## VI. MARKET POWER AND DEFINITION

131. The pharmaceutical marketplace is characterized by a "disconnect" between product selection and the payment obligation. State laws prohibit pharmacists from dispensing many pharmaceutical products, including Entresto, to patients without a prescription. The patient's doctor chooses which product the patient will buy while the patient (and in most cases, his or her insurer) has the obligation to pay for the product.

132. Brand drug companies, including Novartis, exploit this price disconnect by employing large sales forces that visit doctors' offices and persuade them to prescribe the brand

---

[76] *Novartis AG v. Novadoz Pharms. LLC*, 2025 WL 830368 (D.N.J. Mar. 17, 2025).
[77] *Novartis AG v. Novadoz Pharms. LLC*, 2025 WL 1482417 (D.N.J. May 22, 2025).
[78] *Novartis AG v. Novadoz Pharms. LLC*, 2025 WL 1937082 (D.N.J. July 15, 2025).
[79] *Id*.
[80] *Id*. at *2.

drug companies' products. These sales representatives do not advise doctors of the cost of the branded products. Studies show that doctors typically are unaware of the relative costs of brand pharmaceuticals and, even when they are aware of the relative costs, they are largely insensitive to price differences because they do not pay for the products. The result is a marketplace in which price plays a comparatively unimportant role in product selection.

133. The relative unimportance of price to the prescriber reduces what economists call the price elasticity of demand—the extent to which unit sales go down when price goes up. This reduced-price elasticity, in turn, gives brand drug companies the ability to raise price substantially above marginal cost without losing so many sales as to make the price increase unprofitable. The ability to profitably raise prices substantially above marginal costs is what economists and antitrust courts refer to as market power.

134. The result of these pharmaceutical market imperfections and marketing practices is that brand drug companies gain and maintain market power with respect to many branded prescription pharmaceuticals, including Entresto.

135. Before July 22, 2025, Novartis had monopoly power in the market for Entresto because it had the power to maintain the price of Entresto at supracompetitive levels without losing enough sales to make supracompetitive prices unprofitable.

136. Before July 22, 2025, a small but significant, non-transitory increase to the price of Entresto would not have caused a significant loss of sales.

137. Brand Entresto does not exhibit significant, positive cross-elasticity of demand with respect to price with any other drug other than the AB-rated generic versions of Entresto.

138. Entresto is the only ARNI currently on the market.

139. Even with premium pricing, Entresto obtained broad insurance coverage and favorable access. For example, all Medicare Part D plans cover Entresto. Additionally, nearly all commercially covered lives have access to Entresto.[81]

140. Brand Entresto is differentiated from all other drugs other than AB-rated generic versions of Entresto.

141. Novartis needed to control only brand Entresto and its AB-rated generic equivalents, and no other products, in order to maintain the price of Entresto profitably at supracompetitive prices. Only the market entry of competing, AB-rated generic versions of Entresto would render the Novartis unable to profitably maintain its prices for Entresto without losing substantial sales.

142. For several years, Novartis sold brand Entresto at prices well in excess of marginal costs and in excess of the competitive price, and therefore, Novartis had extraordinarily high profit margins.

143. Novartis had and exercised the power to exclude generic competition to brand Entresto.

144. At all material times, high barriers to entry, including regulatory protections and high costs of entry and expansion, protected brand Entresto from the forces of price competition.

145. There is direct evidence of market power and anticompetitive effects available in this case sufficient to show Novartis's ability to control the price of Entresto, and to exclude relevant competitors, without the need to show the relevant antitrust markets. The direct evidence includes, *inter alia*, the following facts: (a) generic Entresto would have entered the market at a

---

[81] *Prior Authorization, Copayments, and Utilization of Sacubitril/Valsartan in Medicare and Commercial Plans in Patients With Heart Failure With Reduced Ejection Fraction*, AHA Journals, https://www.ahajournals.org/doi/10.1161/CIRCOUTCOMES.120.007665 (Sept. 1, 2021).

much earlier date, at a substantial discount to brand Entresto, but for Novartis's anticompetitive conduct; (b) on information and belief, Novartis's gross margin on Entresto (accounting for the costs of marketing and its share of Novartis's ongoing research/development costs) at all relevant times was very high; and (c) Novartis never lowered the price of Entresto to the competitive level in response to the pricing of other brand or generic drugs.

146. To the extent proof of monopoly power by defining a relevant product market is required, Plaintiff alleges that the relevant antitrust product market is the market for brand and generic Entresto.

147. The United States and its territories constitute the relevant geographic market.

148. Novartis's market share in the relevant market was 100% until approximately July 22, 2025, when MSN's marketing partner Novadoz launched MSN's generic Entresto.

## VII. ANTITRUST IMPACT

149. Novartis's acts and practices had the purpose and effect of restraining competition unreasonably and injuring competition by protecting brand Entresto from competition. These actions allowed Novartis to maintain a monopoly and to exclude competition in the market for brand and generic Entresto, to the detriment of Plaintiff and all other members of the Class.

150. Were it not for Novartis's illegal conduct, generic Entresto would have been available in the United States beginning January 16, 2025 at the latest.

151. Plaintiff and Class members have incurred significant injury and damage as a result of the unlawful conduct of Defendant. During the period from January 16, 2025, to the present, Plaintiff purchased, paid for, and/or reimbursed for brand and generic Entresto at supracompetitive levels and has done so in at least Arizona, Florida, Georgia, Nevada, New Jersey, and New York. If the conduct challenged in this complaint had not occurred, Plaintiff

would have paid for brand and generic Entresto under lawful competitive conditions, resulting in a substantial reduction in the amount it would have paid by purchasing generic Entresto and/or brand Entresto at lower prices.

152. Plaintiff and Class members have sustained substantial losses and damage to their business and property in the form of overcharges. The full amount and forms and components of such damages will be calculated after discovery and upon proof at trial. Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supracompetitive charge passed through the chain of distribution to payors such as Plaintiff and Class members.

153. If generic competitors had not been unlawfully prevented from entering the market earlier and competing in the relevant markets, Plaintiff and Class members would have paid less by (a) paying lower prices on their remaining brand purchases of Entresto, and/or (b) substituting purchases of less-expensive generic Entresto for their purchases of more-expensive brand Entresto. In addition, since prices decline over time, had generic Entresto entered the market sooner, the prices that Plaintiff and Class members have paid for generic Entresto since it came onto the market in July 2025 would have been lower

154. The supracompetitive prices Plaintiff and Class members paid are traceable to, and the direct, proximate, and foreseeable result of Novartis's anticompetitive conduct.

## VIII. INTERSTATE AND INTRASTATE COMMERCE

155. During the relevant time period, Novartis manufactured, sold, and shipped Entresto across state lines in an uninterrupted flow of interstate commerce.

156. During the relevant time period, Defendant used various devices to effectuate the illegal acts alleged herein, including the United States mail, interstate and foreign travel, and

interstate and foreign wire commerce. Defendant engaged in illegal activities, as charged herein, within the flow of and substantially affecting interstate commerce.

157. Defendant's conduct was within the flow of and was intended to have and did have a substantial effect on interstate commerce of the United States, including in this district.

158. Defendant's conduct has also had substantial intrastate effects in that, among other things, Class members have been prevented from purchasing more affordable generic versions of Entresto in each state. Defendant's conduct materially deprived the Class members—including hundreds, if not thousands, of purchasers in each state—of any choice to purchase more affordable versions of Entresto. The absence of competition to Entresto has directly and substantially affected and disrupted commerce within each state and substantially affected commerce within each state.

## IX. CLASS ACTION ALLEGATIONS

159. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the following class (the "Class"):

> All persons or entities in the United States, its territories, and the District of Columbia who indirectly purchased or paid for brand or generic Entresto for consumption by themselves, their members, employees, insureds, participants, or beneficiaries, and other than for resale, during the period from at least January 16, 2025 until the effects of Novartis's anticompetitive conduct have ceased (the "Class Period").

160. Excluded from the Class are Defendant and its officers, directors, management, employees, subsidiaries, or affiliates, and all state and federal entities, which do not include cities, towns, municipalities, or counties with self-funded prescription drug plans.

161. The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable. Plaintiff believes that there are hundreds of thousands of members in the Class dispersed throughout the United States. Moreover, given the costs of

complex antitrust litigation, it would be uneconomic for many Class members to bring individual claims and join them together. The Class is readily identifiable from information and records in the possession of Defendant, third-parties, and Class members.

162. Plaintiff and the Class's claims are typical of the claims of the members of the Class as all members of the Class were damaged by the same wrongful conduct of the Defendant, i.e., they paid artificially inflated prices for Entresto and were deprived of earlier and more robust competition from more affordable generic versions of Entresto because of Defendant's wrongful conduct alleged herein.

163. Plaintiff will fairly and adequately protect the interests of the Class. The interests of Plaintiff are coincident with, and not antagonistic to, those of the Class.

164. Plaintiff has retained counsel competent and experienced in the prosecution of class action antitrust litigation, with particular experience with class action litigation involving antitrust violations perpetrated by pharmaceutical manufacturers.

165. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether Novartis unlawfully maintained monopoly power through all or part of the Class Period;

b. whether there exist any legitimate procompetitive reasons for some or all of Novartis's conduct;

c. to the extent such justifications exist, whether there were less restrictive alternatives;

d. whether direct proof of Novartis's monopoly power is available and, if so, whether it is sufficient to prove Novartis's monopoly power without the need to define the relevant market;

e. whether Novartis's improper listing of the '659 patent has substantially affected interstate and/or intrastate commerce;

f. whether Novartis's unlawful listing of the '659 patent caused antitrust injury through overcharges to the business or property of Plaintiff and the members of the Class;

g. whether Novartis's listing of the '659 patent in the Orange Book for Entresto was improper;

h. whether the listing of the '659 patent in the Orange Book harmed competition;

i. whether Novartis's unlawful monopolistic conduct was a substantial contributing factor in causing some amount of delay of the entry of AB-rated generic Entresto or in causing some amount of delay in the market entry of multiple competing AB-rated generic Entresto products;

j. determination of a reasonable estimate of the length of the generic-entry delay caused by the Novartis's unlawful conduct; and

k. the quantum of overcharges paid by the Class in the aggregate.

166. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding

through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

167. Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## X. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### Monopolization Under State Law

168. Plaintiff incorporates by reference all of the allegations above as though fully set forth herein.

169. As described above, Novartis possessed monopoly power nationwide and in each of the states and territories in the market for Entresto and its generic equivalents until approximately July 22, 2025.

170. Novartis possessed substantial market power (i.e., monopoly power) in the relevant market. Novartis possessed the power to control prices in, prevent prices from falling in, and exclude competitors from the relevant market.

171. By improperly listing the ’659 patent in the Orange Book for Entresto, Defendant willfully maintained its monopoly power in the relevant market using restrictive or exclusionary conduct, rather than by means of greater business acumen or a historic accident, and thereby injured Plaintiff and the Class. Defendant’s anticompetitive conduct was done with the specific intent to maintain its monopoly in the market for Entresto in the United States and its territories.

172. Novartis knowingly and intentionally engaged in this conduct to monopolize the Entresto market as described above.

173. The goal, purpose, and effect of Novartis's conduct was to maintain and extend its monopoly power with respect to Entresto. Novartis's improper listing the of the '659 patent in the Orange Book allowed it to continue charging supracompetitive prices for Entresto without a substantial loss of sales, reaping substantial monopoly profits while excluding competition from the market for Entresto.

174. Plaintiff and members of the Class purchased substantial amounts of Entresto indirectly.

175. As a result of Novartis's illegal conduct, Plaintiff and members of the Class were compelled to pay, and did pay, more than they would have paid for their requirements of Entresto absent Novartis's illegal conduct. But for Novartis's illegal conduct, competitors would have begun selling AB-rated generic Entresto during the Class Period, and prices for brand and generic Entresto would have been lower, sooner.

176. Had manufacturers of generic Entresto entered the market and lawfully competed with Novartis earlier, Plaintiff and other members of the Class would have substituted lower-priced generic Entresto for the higher-priced brand-name Entresto for some or all of their requirements of Entresto, and/or would have paid lower net prices on their remaining Entresto purchases.

177. By engaging in the foregoing conduct, Novartis violated the following state antitrust laws:

a. Ariz. Rev. Stat. Ann. §§ 44-1403, *et seq.*, with respect to purchases of Entresto in Arizona by members of the Class.

b. Cal. Bus. & Prof. Code § 16700, with respect to purchases of Entresto in California by members of the Class.

c. Conn. Gen. Stat. §§ 35-27, *et seq.*, with respect to purchases of Entresto in Connecticut by members of the Class.

d. D.C. Code §§ 28-4503, *et seq.*, with respect to purchases of Entresto in the District of Columbia by members of the Class.

e. Haw. Rev. Stat. §§ 480-1, *et seq*. with respect to purchases of Entresto in Hawaii by members of the Class.

f. Illinois Antitrust Act, 740 Ill. Comp. Stat. 10/1, *et seq*., with respect to purchases of Entresto in Illinois by members of the Class.

g. Iowa Code §§ 553.5 *et seq.*, with respect to purchases of Entresto in Iowa by members of the Class.

h. Kan. Stat. Ann. §§ 50-101 *et seq.*, with respect to purchases of Entresto in Kansas by members of the Class.

i. Me. Stat. tit. 10, §§ 1102, *et seq.*, with respect to purchases of Entresto in Maine by consumer members of the Class.

j. Md. Code Ann., Com. Law §§ 11-204(a), *et seq*., with respect to purchases of Entresto in Maryland by members of the Class.

k. Mich. Comp. Laws §§ 445.773, *et seq.*, with respect to purchases of Entresto in Michigan by members of the Class.

l. Minn. Stat. §§ 325D.49, *et seq.*, and Minn. Stat. §§ 8.31, *et seq.*, with respect to purchases of Entresto in Minnesota by members of the Class.

m. Miss. Code Ann. §§ 75-21-3, *et seq.*, with respect to purchases of Entresto in Mississippi by members of the Class.

n. Neb. Rev. Stat. §§ 59-802, *et seq.*, with respect to purchases of Entresto in Nebraska by members of the Class.

o. Nev. Rev. Stat. §§ 598A.060, *et seq.*, with respect to purchases of Entresto in Nevada by members of the Class.

p. N.H. Rev. Stat. Ann. §§ 356.11, *et seq.*, with respect to purchases of Entresto in New Hampshire by members of the Class.

q. N.J. Stat. Ann. § 56:9, with respect to purchases of Entresto in New Jersey by members of the Class.

r. N.M. Stat. Ann. §§ 57-1-2, *et seq.*, with respect to purchases of Entresto in New Mexico by members of the Class.

s. N.Y. Gen. Bus. Law §§ 340, *et seq.*, with respect to purchases of Entresto in New York by members of the Class.

t. N.C. Gen. Stat. §§ 75-2.1, *et seq.*, with respect to purchases of Entresto in North Carolina by members of the Class.

u. N.D. Cent. Code §§ 51-08.1-03, *et seq.*, with respect to purchases of Entresto in North Dakota by members of the Class.

v. Or. Rev. Stat. §§ 646.730, *et seq.*, with respect to purchases of Entresto in Oregon by members of the Class.

w. 50 R.I. Gen. Laws §§ 6-36-5 *et seq.*, with respect to purchases of Entresto in Rhode Island by members of the Class.

x. S.D. Codified Laws §§ 37-1-3.2, *et seq.*, with respect to purchases of Entresto in South Dakota by members of the Class.

y. Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases of Entresto in Tennessee by members of the Class.

z. Utah Code Ann. §§ 76-10-911, *et seq.*, with respect to purchases of Entresto in Utah by members of the Class.

aa. Vt. Stat. Ann. tit. 9, §§ 2453, *et seq.*, with respect to purchases of Entresto in Vermont by consumer members of the Class.

bb. W. Va. Code §§ 47-18-4, *et seq.*, with respect to purchases of Entresto in West Virginia by members of the Class.

cc. Wis. Stat. §§ 133.03, *et seq.*, with respect to purchases of Entresto in Wisconsin by members of the Class.

178. Plaintiff and members of the Class have been injured in their business or property by reason of Defendant's antitrust violations alleged in this Claim. Their injuries consist of: (1) being denied the opportunity to purchase lower-priced generic Entresto, and (2) paying higher prices for Entresto than they would have paid in the absence of Defendant's conduct. These injuries are of the type that antitrust laws were designed to prevent, and flow from that which makes Defendant's conduct unlawful.

179. Plaintiff and the Class seek multiple damages as permitted by law for their injuries by Defendant's violations of the aforementioned statutes.

**SECOND CLAIM FOR RELIEF**

**Unfair or Deceptive Trade Practices**

180. Plaintiff incorporates by reference all of the allegations above as though fully set forth herein.

181. Defendant engaged in unfair competition, and/or unfair/unconscionable, and/or deceptive acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Defendant's anticompetitive, deceptive, unfair, and/or unconscionable acts or practices, Plaintiff and Class members were deprived of the opportunity to purchase a less expensive generic version of Entresto and forced to pay higher prices in violation of the following consumer protection statutes:

a. Alaska Stat. §§ 45.50.471, *et seq*., with respect to purchases in Alaska by members of the Class. Defendant engaged in unfair methods of competition and unfair practices in the conduct of trade and commerce.

b. Cal. Bus. & Prof. Code §§ 17200, *et seq*., with respect to purchases in California by members of the Class. Defendant engaged in business practices that are unfair in that they are immoral, unethical, oppressive, unscrupulous, and substantially injurious to Class members. There are no countervailing benefits to Class members and any utility of defendant's conduct is outweighed by the consequences to Class members.

c. Fla. Stat. §§ 501.201, *et seq*., with respect to purchases in Florida by members of the Class.

d. Illinois Consumer Fraud Act, 815 Ill. Comp. Stat. 505/1, *et seq*., with respect to purchases in Illinois by members of the Class.

e. Mass. Gen Laws ch. 93A, §§ 1, *et seq*., with respect to purchases in Massachusetts by members of the Class.

f. Mo. Rev. Stat. §§ 407.020, *et seq*., with respect to purchases in Missouri by consumer members of the Class.

g. Mont. Code Ann. §§ 30-14-101, *et seq*., with respect to purchases in Montana by consumer members of the Class. Defendant engaged in unfair and deceptive acts and practices.

h. N.J. Stat. Ann. §§ 56:8-1 *et seq*., with respect to purchases in New Jersey by members of the Class.

i. S.C. Code Ann. §§ 39-5-20, *et seq*., with respect to purchases in South Carolina by Class members. Defendant engaged in unfair methods of competition and unfair practices in the conduct of trade and commerce.

j. Vt. Stat. Ann. tit. 9, §§ 2453, *et seq*., with respect to purchases in Vermont by consumer members of the Class. Defendant engaged in unfair methods of competition, unfair practices, and deceptive practices in the conduct of trade and commerce.

182. Plaintiff and members of the Class have been injured in their business and property by reason of Defendant's anticompetitive, unfair/unconscionable, and/or deceptive acts or practices alleged in this Count. Their injury consists of paying higher prices for Entresto than they would have paid in the absence of these violations. This injury is of the type the state consumer protection statutes were designed to prevent and directly results from Defendant's unlawful conduct.

**THIRD CLAIM FOR RELIEF**

**Unjust Enrichment**

183. Plaintiff incorporates by reference all of the allegations above as though fully set forth herein.

184. To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

185. As a result of its unlawful conduct described above, Defendant has been, and will continue to be, unjustly enriched. Defendant has been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on Entresto.

186. Defendant's financial benefits are traceable to Plaintiff's and Class members' overpayments for Entresto.

187. Plaintiff and Class members have conferred, and continue to confer, an economic benefit upon Defendant in the nature of profits resulting from the unlawful overcharges described herein, to the economic detriment of Plaintiff and Class members.

188. Defendant has benefited from its unlawful acts and it would be inequitable for Defendant to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiff and the members of the Class for Entresto during the Class Period.

189. It would be futile for Plaintiff and Class members to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased Entresto, as those intermediaries are not liable and would not compensate Plaintiff and Class members for Defendant's unlawful conduct.

190. The economic benefit Defendant derived from overcharging Plaintiff and Class members for Entresto is a direct and proximate result of Defendant's unlawful and anticompetitive practices.

191. The financial benefits Defendant derived are ill-gotten gains that rightfully belong to Plaintiff and Class members, who paid, and continue to pay, artificially inflated prices that inured to Defendant's benefit.

192. It would be inequitable under unjust enrichment principles under the laws of the states described below for Defendant to retain any of the overcharges Plaintiff and Class members paid for Entresto that were derived from Defendant's unfair, anticompetitive, and unlawful methods, acts, and trade practices.

193. Defendant is aware of and appreciates the benefits that Plaintiff and the Class members have bestowed upon it.

194. Defendant should be ordered to disgorge all unlawful or inequitable proceeds it received in a common fund for the benefit of Plaintiff and Class members, who collectively have no adequate remedy at law.

195. A constructive trust should be imposed upon all unlawful or inequitable sums Defendant received, which arise from overpayments for Entresto by Plaintiff and the Class members.

196. Plaintiff and Class members have no adequate remedy at law.

197. By engaging in the foregoing unlawful or inequitable conduct, which deprived Plaintiff and Class members of the opportunity to purchase lower-priced generic versions of Entresto and forced them to pay higher prices for Entresto, Defendant has been unjustly enriched in violation of the common law of various states and commonwealths, as outlined below:

**Alabama**

198. Defendant unlawfully overcharged end-payers who made purchases of, or reimbursements for, Entresto in Alabama at prices that were more than they would have been but for Defendant's actions.

199. Plaintiff and Class members have conferred an economic benefit upon Defendant, in the nature of revenue resulting from unlawful overcharges to the economic detriment of

Plaintiff and Class members. Defendant accepted and retained the benefits bestowed upon it under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiff and Class members.

200. Defendant has benefitted at the expense of Plaintiff and Class members from revenue resulting from unlawful overcharges for Entresto.

**Alaska**

201. Defendant unlawfully overcharged end-payers who made purchases of, or reimbursements for, Entresto in Alaska at prices that were more than they would have been but for Defendant's actions.

202. Plaintiff and Class members have conferred an economic benefit upon Defendant, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

203. Defendant appreciated the benefits bestowed upon it by Plaintiff and Class members.

204. Defendant accepted and retained the benefits bestowed upon it under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiff and Class members.

205. Under the circumstances, it would be inequitable for Defendant to retain such benefits without compensating Plaintiff and Class members.

206. Defendant has benefitted at the expense of Plaintiff and Class members from revenue resulting from unlawful overcharges for Entresto.

**Arizona**

207. Defendant unlawfully overcharged end-payers, who made purchases of, or reimbursements for, Entresto in Arizona at prices that were more than they would have been but for Defendant's actions.

208. Defendant has been enriched by revenue resulting from unlawful overcharges for brand Entresto.

209. Plaintiff has been impoverished by the overcharges for Entresto resulting from Defendant's unlawful conduct.

210. Defendant's enrichment and Plaintiff's impoverishment are connected. Defendant has paid no consideration to any other person for any benefits they received from Plaintiff and Class members.

211. There is no justification for Defendant's receipt of the benefits causing its enrichment and Plaintiff's impoverishment, because Plaintiff paid anticompetitive prices that inured to Defendant's benefit, and it would be inequitable for Defendant to retain any revenue gained from their unlawful overcharges.

212. Plaintiff and Class members have no remedy at law.

**Arkansas**

213. Defendant unlawfully overcharged end-payers, who made purchases of, or reimbursements for, Entresto in Arkansas at prices that were more than they would have been but for Defendant's actions.

214. Defendant received money from Plaintiff and Class members as a direct result of the unlawful overcharges and have retained this money.

215. Defendant has paid no consideration to any other person in exchange for this money.

216. Under the circumstances, it would be inequitable for Defendant to retain such benefits without compensating Plaintiff and Class members.

**California**

217. Defendant unlawfully overcharged end-payers, who made purchases of, or reimbursements for, Entresto in California at prices that were more than they would have been but for Defendant's actions.

218. Plaintiff and Class members have conferred an economic benefit upon Defendant in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

219. Defendant retained the benefit bestowed upon it under inequitable and unjust circumstances at the expense of Plaintiff and Class members.

**Colorado**

220. Defendant unlawfully overcharged end-payers, who made purchases of, or reimbursements for, Entresto in Colorado at prices that were more than they would have been but for Defendant's actions.

221. Defendant has received a benefit from Plaintiff and Class members in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendant.

222. Defendant has benefitted at the expense of Plaintiff and Class members.

223. Under the circumstances, it would be inequitable for Defendant to retain such benefits without compensating Plaintiff and Class members.

**Connecticut**

224. Defendant unlawfully overcharged end-payers, who made purchases of, or reimbursements for, Entresto in Connecticut at prices that were more than they would have been but for Defendant's actions.

225. Defendant was benefitted in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

226. Defendant has paid no consideration to any other person in exchange for this benefit.

227. Defendant retained the benefits bestowed upon it under inequitable and unjust circumstances at the expense of Plaintiff and Class members.

**Delaware**

228. Defendant unlawfully overcharged end-payers, who made purchases of, or reimbursements for, Entresto in Delaware at prices that were more than they would have been but for Defendant's actions.

229. Defendant has been enriched by revenue resulting from unlawful overcharges for Entresto.

230. Plaintiff and Class members have been impoverished by the overcharges for Entresto resulting from Defendant's unlawful conduct.

231. Defendant's enrichment and Plaintiff's impoverishment are connected.

232. There is no justification for Defendant's receipt of the benefits causing its enrichment, because Plaintiff and Class members paid supracompetitive prices that inured to Defendant's benefit, and it would be inequitable for Defendant to retain any revenue gained from its unlawful overcharges.

233. Plaintiff and Class members have no remedy at law.

**Florida**

234. Defendant unlawfully overcharged end-payers, who made purchases of, or reimbursements for, Entresto in Florida at prices that were more than they would have been but for Defendant's actions.

235. Plaintiff and the Class members have conferred an economic benefit upon Defendant, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and the Class members.

236. Defendant appreciated the benefits bestowed upon them by Plaintiff and the Class members.

237. It is inequitable for Defendant to accept and retain the benefits received without compensating Plaintiff and the Class members.

**Georgia**

238. Defendant unlawfully overcharged end-payers, who made purchases of, or reimbursements for, Entresto in Georgia at prices that were more than they would have been but for Defendant's actions.

239. Plaintiff and Class members have conferred an economic benefit upon Defendant in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

240. Under the circumstances, it would be inequitable for Defendant to retain such benefits without compensating Plaintiff and Class members.

**Hawaii**

241. Defendant unlawfully overcharged end-payers, who made purchases of, or reimbursements for, Entresto in Hawaii at prices that were more than they would have been but for Defendant's actions.

242. Plaintiff and Class members have conferred an economic benefit upon Defendant in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

243. It is unjust for Defendant to retain the benefits received without compensating Plaintiff and Class members.

**Idaho**

244. Defendant unlawfully overcharged end-payers, who made purchases of, or reimbursements for, Entresto in Idaho at prices that were more than they would have been but for Defendant's actions.

245. Plaintiff and Class members have conferred an economic benefit upon Defendant in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

246. Defendant appreciated the benefit conferred upon it by Plaintiff and Class members.

247. Under the circumstances, it would be inequitable for Defendant to retain such benefits without compensating Plaintiff and Class members.

**Illinois**

248. Defendant unlawfully overcharged end-payers, who made purchases of, or reimbursements for, Entresto in Illinois at prices that were more than they would have been but for Defendant's actions.

249. Plaintiff and Class members have conferred an economic benefit upon Defendant in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

250. Defendant retained the benefits bestowed upon it under unjust circumstances arising from unlawful overcharges to Plaintiff and Class members.

251. It is unjust and inequitable for Defendant to retain the benefits received without compensating Plaintiff and Class members.

**Iowa**

252. Defendant unlawfully overcharged end-payers, who made purchases of, or reimbursements for, Entresto in Iowa at prices that were more than they would have been but for Defendant's actions.

253. Defendant has been enriched by revenue resulting from unlawful overcharges for Entresto, which revenue resulted from anticompetitive prices paid by Plaintiff and Class members, which inured to Defendant's benefit.

254. Defendant's enrichment has occurred at the expense of Plaintiff and Class members.

255. It is against equity and good conscience for Defendant to be permitted to retain the revenue resulting from their unlawful overcharges.

**Kansas**

256. Defendant unlawfully overcharged end-payers, who made purchases of, or reimbursements for, Entresto in Kansas at prices that were more than they would have been but for Defendant's actions.

257. Plaintiff and Class members have conferred an economic benefit upon Defendant in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

258. Defendant retained the benefits bestowed upon it under unjust circumstances arising from unlawful overcharges to Plaintiff and Class members.

259. Defendant was unjustly enriched at the expense of Plaintiff and Class members.

**Kentucky**

260. Defendant unlawfully overcharged end-payers, who made purchases of, or reimbursements for, Entresto in Kentucky at prices that were more than they would have been but for Defendant's actions.

261. Plaintiff and Class members have conferred an economic benefit upon Defendant in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

262. Defendant appreciated the benefit conferred upon them by Plaintiff and Class members.

263. Under the circumstances, it would be inequitable for Defendant to retain such benefits without compensating Plaintiff and Class members.

**Louisiana**

264. Defendant unlawfully overcharged end-payers, who made purchases of, or reimbursements for, Entresto in Louisiana at prices that were more than they would have been but for Defendant's actions.

265. Defendant has been enriched by revenue resulting from unlawful overcharges for Entresto.

266. Plaintiff and Class members have been impoverished by the overcharges for Entresto resulting from Defendant's unlawful conduct.

267. Defendant's enrichment and Plaintiff's impoverishment are connected.

268. There is no justification for Defendant's receipt of the benefits causing its enrichment, because Plaintiff and Class members paid supracompetitive prices that inured to Defendant's benefit, and it would be inequitable for Defendant to retain any revenue gained from their unlawful overcharges.

269. Plaintiff and Class members have no other remedy at law.

**Maine**

270. Defendant unlawfully overcharged end-payers, who made purchases of, or reimbursements for, Entresto in Maine at prices that were more than they would have been but for Defendant's actions.

271. Plaintiff and Class members have conferred an economic benefit upon Defendant in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

272. Defendant retained the benefits bestowed upon it under unjust circumstances arising from unlawful overcharges to Plaintiff and Class members.

273. Defendant was aware of, and appreciated, the benefit bestowed upon them by Plaintiff and Class members.

274. Defendant was unjustly enriched at the expense of Plaintiff and Class members.

**Maryland**

275. Defendant unlawfully overcharged end-payers, who made purchases of, or reimbursements for, Entresto in Maryland at prices that were more than they would have been but for Defendant's actions.

276. Plaintiff and Class members have conferred an economic benefit upon Defendant in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

277. Defendant was aware of, or appreciated, the benefit bestowed upon it by Plaintiff and Class members.

278. Under the circumstances, it would be inequitable for Defendant to retain such benefits without compensating Plaintiff and Class members.

**Massachusetts**

279. Defendant unlawfully overcharged end-payers, who made purchases of, or reimbursements for, Entresto in Massachusetts at prices that were more than they would have been but for Defendant's actions.

280. Plaintiff and Class members have conferred an economic benefit upon Defendant in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

281. Defendant was aware of, or appreciated, the benefit conferred upon it by Plaintiff and Class members.

282. Under the circumstances, it would be inequitable for Defendant to retain such benefits without compensating Plaintiff and Class members. Fairness and good conscience require that Defendant not be permitted to retain the revenue resulting from its unlawful overcharges at the expense of Plaintiff and Class members.

**Michigan**

283. Defendant unlawfully overcharged end-payers, who made purchases of, or reimbursements for, Entresto in Michigan at prices that were more than they would have been but for Defendant's actions.

284. Plaintiff and Class members have conferred an economic benefit upon Defendant in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

285. Defendant retained the benefits bestowed upon it under unjust circumstances arising from unlawful overcharges to Plaintiff and Class members.

286. Defendant was unjustly enriched at the expense of Plaintiff and Class members.

**Minnesota**

287. Defendant unlawfully overcharged end-payers, who made purchases of, or reimbursements for, Entresto in Minnesota at prices that were more than they would have been but for Defendant's actions.

288. Defendant appreciated and knowingly accepted the benefits bestowed upon it by Plaintiff and Class members. Defendant has paid no consideration to any other person for any of the benefits it has received from Plaintiff and Class members.

289. It is inequitable for Defendant to accept and retain the benefits received without compensating Plaintiff and Class members.

**Mississippi**

290. Defendant unlawfully overcharged end-payers, who made purchases of, or reimbursements for, Entresto in Mississippi at prices that were more than they would have been but for Defendant's actions.

291. Defendant retains the benefit of overcharges received on the sales of Entresto, which in equity and good conscience belong to Plaintiff and Class members on account of Defendant's anticompetitive conduct.

**Missouri**

292. Defendant unlawfully overcharged end-payers, who made purchases of, or reimbursements for, Entresto in Missouri at prices that were more than they would have been but for Defendant's actions.

293. Plaintiff and Class members have conferred an economic benefit upon Defendant in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

294. Defendant appreciated the benefit bestowed upon it by Plaintiff and Class members.

295. Defendant accepted and retained the benefit bestowed upon it under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiff and Class members.

**Montana**

296. Defendant unlawfully overcharged end-payers, who made purchases of, or reimbursements for, Entresto in Montana at prices that were more than they would have been but for Defendant's actions.

297. Plaintiff and Class members have conferred an economic benefit upon Defendant in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

298. Under the circumstances, it would be inequitable for Defendant to retain such benefits without compensating Plaintiff and Class members.

**Nebraska**

299. Defendant unlawfully overcharged end-payers, who made purchases of, or reimbursements for, Entresto in Nebraska at prices that were more than they would have been but for Defendant's actions.

300. Defendant received money from Plaintiff and Class members as a direct result of the unlawful overcharges, and has retained this money. Defendant has paid no consideration to any other person in exchange for this money.

301. In justice and fairness, Defendant should disgorge such money and remit the overcharged payments back to Plaintiff and Class members.

**Nevada**

302. Defendant unlawfully overcharged end-payers, who made purchases of, or reimbursements for, Entresto in Nevada at prices that were more than they would have been but for Defendant's actions.

303. Plaintiff and Class members have conferred an economic benefit upon Defendant in the nature of revenue resulting from unlawful overcharges for brand and generic versions of Entresto.

304. Defendant appreciated the benefits bestowed upon it by Plaintiff and Class members, for which it has paid no consideration to any other person.

305. Defendant has knowingly accepted and retained the benefits bestowed upon it by Plaintiff and Class members.

306. The circumstances under which Defendant has accepted and retained the benefits bestowed upon it by Plaintiff and Class members are inequitable in that they result from Defendant's unlawful overcharges for Entresto.

**New Hampshire**

307. Defendant unlawfully overcharged end-payers, who made purchases of, or reimbursements for, Entresto in New Hampshire at prices that were more than they would have been but for Defendant's actions.

308. Defendant has received a benefit from Plaintiff in the nature of revenue resulting from the unlawful overcharges, which resulted from anticompetitive prices that inured to the benefit of Defendant.

309. Under the circumstances, it would be unconscionable for Defendant to retain such benefits.

**New Jersey**

310. Defendant unlawfully overcharged end-payers, who made purchases of, or reimbursements for, Entresto in New Jersey at prices that were more than they would have been but for Defendant's actions.

311. Defendant has received a benefit from Plaintiff and Class members in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendant.

312. The benefits conferred upon Defendant were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from unlawful overcharges to Plaintiff and Class members.

313. Defendant has paid no consideration to any other person for any of the unlawful benefits they received from Plaintiff and Class members with respect to Defendant's sales of Entresto.

314. Under the circumstances, it would be unjust for Defendant to retain such benefits without compensating Plaintiff and Class members.

**New Mexico**

315. Defendant unlawfully overcharged end-payers, who made purchases of, or reimbursements for, Entresto in New Mexico at prices that were more than they would have been but for Defendant's actions.

316. Defendant has knowingly benefitted at the expense of Plaintiff and Class members from revenue resulting from unlawful overcharges for Entresto.

317. To allow Defendant to retain the benefits would be unjust because the benefits resulted from anticompetitive pricing that inured to Defendant's benefit and because Defendant has paid no consideration to any other person for any of the benefits they received.

**New York**

318. Defendant unlawfully overcharged end-payers, who made purchases of, or reimbursements for, Entresto in New York at prices that were more than they would have been but for Defendant's actions.

319. Defendant has been enriched by revenue resulting from unlawful overcharges for Entresto, which resulted from anticompetitive prices paid by Plaintiff and Class members, which inured to Defendant's benefit.

320. Defendant's enrichment has occurred at the expense of Plaintiff and Class members.

321. It is against equity and good conscience for Defendant to be permitted to retain the revenue resulting from its unlawful overcharges.

**North Carolina**

322. Defendant unlawfully overcharged end-payers, who made purchases of, or reimbursements for, Entresto in North Carolina at prices that were more than they would have been but for Defendant's actions.

323. Plaintiff and Class members have conferred an economic benefit upon Defendant in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

324. Plaintiff did not interfere with Defendant's affairs in any manner that conferred these benefits upon Defendant.

325. The benefits conferred upon Defendant were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from Defendant's actions to delay entry of generic versions of Entresto to the market.

326. The benefits conferred upon Defendant are measurable, in that the revenue Defendant has earned due to unlawful overcharges is ascertainable by review of sales records and documents relating to Defendant's anticompetitive conduct.

327. Defendant consciously accepted the benefits and continues to do so as of the date of this filing.

**North Dakota**

328. Defendant unlawfully overcharged end-payers, who made purchases of, or reimbursements for, Entresto in North Dakota at prices that were more than they would have been but for Defendant's actions.

329. Defendant has been enriched by revenue resulting from unlawful overcharges for Entresto.

330. Plaintiff has been impoverished by the overcharges for Entresto resulting from Defendant's unlawful conduct.

331. Defendant's enrichment and Plaintiff's impoverishment are connected. Defendant has paid no consideration to any other person for any benefits they received directly or indirectly from Plaintiff and Class members.

332. There is no justification for Defendant's receipt of the benefits causing its enrichment, because Plaintiff paid anticompetitive prices that inured to Defendant's benefit, and it would be inequitable for Defendant to retain any revenue gained from its unlawful overcharges.

333. Plaintiff and Class members have no remedy at law.

**Oklahoma**

334. Defendant unlawfully overcharged end-payers, who made purchases of, or reimbursements for, Entresto in Oklahoma at prices that were more than they would have been but for Defendant's actions.

335. Defendant received money from Plaintiff and Class members as a direct result of the unlawful overcharges and have retained this money.

336. Defendant has paid no consideration to any other person in exchange for this money.

337. Plaintiff and Class members have no remedy at law.

338. It is against equity and good conscience for Defendant to be permitted to retain the revenue resulting from its unlawful overcharges.

**Oregon**

339. Defendant unlawfully overcharged end-payers, who made purchases of, or reimbursements for, Entresto in Oregon at prices that were more than they would have been but for Defendant's actions.

340. Plaintiff and Class members have conferred an economic benefit upon Defendant in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

341. Defendant was aware of the benefit bestowed upon them by Plaintiff and Class members.

342. It would be inequitable and unjust for Defendant to retain any of the overcharges for Entresto derived from Defendant's unfair conduct without compensating Plaintiff and Class members.

**Pennsylvania**

343. Defendant unlawfully overcharged end-payers, who made purchases of, or reimbursements for, Entresto in Pennsylvania at prices that were more than they would have been but for Defendant's actions.

344. Plaintiff and Class members have conferred an economic benefit upon Defendant in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

345. Defendant appreciated the benefit bestowed upon it by Plaintiff and Class members.

346. Under the circumstances, it would be inequitable for Defendant to retain such benefits without compensating Plaintiff and Class members.

**Rhode Island**

347. Defendant unlawfully overcharged end-payers, who made purchases of, or reimbursements for, Entresto in Rhode Island at prices that were more than they would have been but for Defendant's actions.

348. Plaintiff and Class members have conferred an economic benefit upon Defendant in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

349. Defendant was aware of, and/or recognized, the benefit bestowed upon it by Plaintiff and Class members.

350. Under the circumstances, it would be inequitable for Defendant to retain such benefits without compensating Plaintiff and Class members.

**South Carolina**

351. Defendant unlawfully overcharged end-payers, who made purchases of, or reimbursements for, Entresto in South Carolina at prices that were more than they would have been but for Defendant's actions.

352. The benefits conferred upon Defendant were not gratuitous, in that they comprised revenue created by unlawful overcharges to Plaintiff and Class members.

353. Defendant realized value from the benefit bestowed upon it by Plaintiff and Class members.

354. Under the circumstances, it would be inequitable for Defendant to retain such benefits without compensating Plaintiff and Class members.

**South Dakota**

355. Defendant unlawfully overcharged end-payers, who made purchases of, or reimbursements for, Entresto in South Dakota at prices that were more than they would have been but for Defendant's actions.

356. Plaintiff and Class members have conferred an economic benefit upon Defendant in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

357. Defendant was aware of the benefit bestowed upon it by Plaintiff and Class members.

358. Under the circumstances, it would be inequitable and unjust for Defendant to retain such benefits without reimbursing Plaintiff and Class members.

**Tennessee**

359. Defendant unlawfully overcharged end-payers, who made purchases of, or reimbursements for, Entresto in Tennessee at prices that were more than they would have been but for Defendant's actions.

360. Plaintiff and Class members have conferred an economic benefit upon Defendant in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

361. Defendant was aware of, or appreciated, the benefit bestowed upon them by Plaintiff and Class members.

362. Under the circumstances, it would be inequitable for Defendant to retain such benefits without compensating Plaintiff and Class members.

363. It would be futile for Plaintiff and Class members to exhaust all remedies against the entities with which Plaintiff and Class members have privity of contract because Plaintiff and Class members did not purchase Entresto directly from Defendant.

**Texas**

364. Defendant unlawfully overcharged end-payers, who made purchases of, or reimbursements for, Entresto in Texas at prices that were more than they would have been but for Defendant's actions.

365. Defendant has received a benefit from Plaintiff and Class members in the nature of revenue resulting from the unlawful overcharges, which resulted from anticompetitive prices that inured to the benefit of Defendant.

366. Defendant was aware of or appreciated the benefit bestowed upon them by Plaintiff and Class members.

367. The circumstances under which Defendant has retained the benefits bestowed upon them by Plaintiff and Class members are inequitable in that they result from Defendant's unlawful overcharges for Entresto.

368. Plaintiff and Class members have no remedy at law.

**Utah**

369. Defendant unlawfully overcharged end-payers, who made purchases of, or reimbursements for, Entresto in Utah at prices that were more than they would have been but for Defendant's actions.

370. Plaintiff and Class members have conferred an economic benefit upon Defendant in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

371. Defendant was aware of, or appreciated, the benefit bestowed upon it by Plaintiff and Class members.

372. Under the circumstances, it would be inequitable for Defendant to retain such benefits without compensating Plaintiff and Class members.

**Vermont**

373. Defendant unlawfully overcharged end-payers, who made purchases of, or reimbursements for, Entresto in Vermont at prices that were more than they would have been but for Defendant's actions.

374. Plaintiff and Class members have conferred an economic benefit upon Defendant in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

375. Defendant accepted the benefit bestowed upon it by Plaintiff and Class members.

376. Under the circumstances, it would be inequitable for Defendant to retain such benefits without compensating Plaintiff and Class members.

**Virginia**

377. Defendant unlawfully overcharged end-payers, who made purchases of, or reimbursements for, Entresto in Virginia at prices that were more than they would have been but for Defendant's actions.

378. Plaintiff and Class members have conferred an economic benefit upon Defendant in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

379. Defendant was aware of the benefit bestowed upon them.

380. Defendant should reasonably have expected to repay Plaintiff and Class members.

381. The benefits conferred upon Defendant were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendant's illegal and unfair actions to inflate the prices of Entresto.

382. Defendant has paid no consideration to any other person for any of the benefits they have received from Plaintiff and Class members.

**Washington**

383. Defendant unlawfully overcharged end-payers, who made purchases of, or reimbursements for, Entresto in Washington at prices that were more than they would have been but for Defendant's actions.

384. Plaintiff and Class members have conferred an economic benefit upon Defendant in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

385. Defendant was aware of, or appreciated, the benefit conferred upon them by Plaintiff and Class members.

386. Under the circumstances, it would be inequitable for Defendant to retain such benefits without compensating Plaintiff and Class members.

**West Virginia**

387. Defendant unlawfully overcharged end-payers, who made purchases of, or reimbursements for, Entresto in West Virginia at prices that were more than they would have been but for Defendant's actions.

388. Plaintiff and Class members have conferred an economic benefit upon Defendant in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

389. Defendant was aware of, or appreciated, the benefit bestowed upon it by Plaintiff and Class members.

390. Under the circumstances, it would be inequitable for Defendant to retain such benefits without compensating Plaintiff and Class members.

**Wisconsin**

391. Defendant unlawfully overcharged end-payers, who made purchases of, or reimbursements for, Entresto in Wisconsin at prices that were more than they would have been but for Defendant's actions.

392. Plaintiff and Class members have conferred an economic benefit upon Defendant in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

393. Defendant appreciated the benefit bestowed upon it by Plaintiff and Class members.

394. Under the circumstances, it would be inequitable for Defendant to retain such benefits without compensating Plaintiff and Class members.

**Wyoming**

395. Defendant unlawfully overcharged end-payers, who made purchases of, or reimbursements for, Entresto in Wyoming at prices that were more than they would have been but for Defendant's actions.

396. Plaintiff and Class members have conferred an economic benefit upon Defendant in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

397. Defendant accepted, used, and enjoyed the benefits bestowed upon them by Plaintiff and Class members.

398. Under the circumstances, it would be inequitable for Defendant to retain such benefits without compensating Plaintiff and Class members.

**District of Columbia**

399. Defendant unlawfully overcharged end-payers, who made purchases of, or reimbursements for, Entresto in the District of Columbia at prices that were more than they would have been but for Defendant's actions.

400. Plaintiff and Class members have conferred an economic benefit upon Defendant in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

401. Defendant accepted and retained the benefit bestowed upon it under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiff and Class members.

402. Under the circumstances, it would be inequitable and unjust for Defendant to retain such benefits.

**Puerto Rico**

403. Defendant unlawfully overcharged end-payers, who made purchases of, or reimbursements for, Entresto in Puerto Rico at prices that were more than they would have been but for Defendant's actions.

404. Defendant has been enriched by revenue resulting from unlawful overcharges for brand and generic Entresto.

405. Plaintiff has been impoverished by the overcharges for Entresto resulting from Defendant's unlawful conduct.

406. Defendant's enrichment and Plaintiff's impoverishment are connected.

407. There is no justification for Defendant's receipt of the benefits causing its enrichment and Plaintiff's impoverishment, because Plaintiff paid anticompetitive prices that inured to Defendant's benefit, and it would be inequitable for Defendant to retain any revenue gained from their unlawful overcharges.

408. Plaintiff and Class members have no remedy at law.

## XI. ADEQUATE REMEDIES AT LAW

409. To the extent that equitable relief is sought under any of the above claims, Plaintiff pleads such claims in the alternative to any legal claims and further plead that their legal claims do not provide adequate remedies at law. Until discovery and other pretrial matters are complete, the extent to which the legal claims above may provide the same relief for the same harms as could be available under claims providing equitable relief is unknown. Restitution may, for example, be measured differently than legal damages and provide for a different amount of relief.

The difference between the value of restitution and legal relief will therefore be unknown until, at the earliest, the completion of expert reports and discovery.

## XII. DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff, on behalf of itself and the proposed Class, respectfully demands that this Court:

a) Determine that this action may be maintained as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2), be given to the Class, and appoint Plaintiff as the named representative of the Class;

b) Award Plaintiff and the Class damages (including, to the extent applicable, treble damages) in an amount to be determined at trial, plus interest in accordance with law;

c) Enter judgment against Defendant and in favor of Plaintiff and the Class;

d) Grant Plaintiff and the Class equitable relief in the nature of disgorgement, restitution, and the creation of a constructive trust to remedy the Defendant's unjust enrichment;

e) Award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees, as provided by law; and

f) Award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## XIII. JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff, on behalf of itself and the proposed Class, demands a trial by jury on all issues so triable.

DATED: August 29, 2025

Respectfully submitted,

**KESSLER TOPAZ MELTZER & CHECK, LLP**

/s/ *Joseph H. Meltzer*
Joseph H. Meltzer
jmeltzer@ktmc.com
Terence S. Ziegler (*pro hac vice* forthcoming)
tziegler@ktmc.com
Lisa Lamb Port (*pro hac vice* forthcoming)
llambport@ktmc.com
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

**CARELLA BYRNE CECCHI BRODY & AGNELLO, PC**
James E. Cecchi
jcecchi@carellabyrne.com
Donald A. Ecklund
decklund@carellabyrne.com
Kevin Cooper
kcooper@carellabyrne.com
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Thomas M. Sobol (*pro hac vice* forthcoming)
tom@hbsslaw.com
Gregory T. Arnold (*pro hac vice* forthcoming)
grega@hbsslaw.com
1 Faneuil Hall Square, 5th Floor
Boston, MA 02109
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

**GIRARD SHARP LLP**
Dena C. Sharp (*pro hac vice* forthcoming)
dsharp@girardsharp.com
Scott Grzenczyk (*pro hac vice* forthcoming)
scottg@girardsharp.com
Kyle Quackenbush (*pro hac vice* forthcoming)

kquackenbush@girardsharp.com
Jordan N. Isern (*pro hac vice* forthcoming)
jisern@girardsharp.com
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846

*Counsel for Plaintiff and the Proposed Class*